## THUNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Roque "Rocky" De la Fuente, and
Rocky 2016 LLC,

               Plaintiffs,

    v.

DNC Services Corporation d/b/a
Democratic National Committee, and
Deborah Wasserman Schultz,

               Defendants.

Civil Action No. 1:18-cv-00336-RC

## DEFENDANTS' MOTION TO DISMISS COMPLAINT AND STATEMENT OF
## POINTS AND AUTHORITIES IN SUPPORT

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ............................................................................................ 3

III.    STANDARD OF REVIEW .............................................................................. 6

IV.     ARGUMENT ................................................................................................. 7

    A.      Count I (Breach of Implied Contract) Should Be Dismissed. ............................. 7

        1.      Plaintiffs Fail to Plausibly Allege that an Implied Contract Existed between the Parties. ................................................................... 8

        2.      Plaintiffs Fail to Plausibly Allege that the DNC Breached Any Contract........................................................................................ 19

    B.      Count II (Promissory Estoppel) Should Be Dismissed...................................... 21

    C.      Count III (Section 1981) Should Be Dismissed................................................. 23

        1.      Plaintiffs Fail to Plausibly Allege the Existence of an Implied Contract........................................................................................ 23

        2.      Even if Plaintiffs Adequately Alleged the Existence of an Implied Contract, Plaintiffs Fail to Plausibly Allege Racial Discrimination. ....... 24

    D.      Count IV (Section 1985) Should Be Dismissed. ............................................... 27

    E.      Counts V & VI (Fraud and Negligent Misrepresentation) Should Be Dismissed....................................................................................................... 31

V.      CONCLUSION.............................................................................................. 34

# TABLE OF AUTHORITIES

**Page**

CASES

*Ali v. U.S. Parole Comm'n*,
   No. CIV.A.06 0235(RCL), 2007 WL 902312 (D.D.C. Mar. 23, 2007) ...................................1

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................................6, 27

*Baker v. Gurfein*,
   744 F. Supp. 2d 311 (D.D.C. 2010) ....................................................................................33

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007)..............................................................................................................27

*Bennett v. Kiggins*,
   377 A.2d 57 (D.C. 1977) ......................................................................................................32

*Berg v. Obama*,
   574 F. Supp. 2d 509 (E.D. Pa. 2008), *aff'd*, 56 F.3d 234 (3d Cir. 2009)................................18

*Berry Law PLLC v. Kraft Foods Grp., Inc.*,
   No. CV 13-0475 (RBW), 2013 WL 12061613 (D.D.C. Dec. 11, 2013) ...............................17

*Bloomgarden v. Coyer*,
   479 F.2d 201 (D.C. Cir. 1973) ........................................................................................10, 17

*Bray v. Alexandria Women's Health Clinic*,
   976 F.2d 45 (D.C. Cir. 1992) ................................................................................................31

*Bray v. Hebble*,
   506 U.S. 263 (1993)........................................................................................................24, 25

*Bray v. RHT, Inc.*,
   748 F. Supp. 3 (D.D.C. 1990) ..............................................................................................25

*Bretz v. Kelman*,
   773 F.2d 1026 (9th Cir. 1985) ........................................................................................27, 31

*Brown v. Sessoms*,
   774 F.3d 1016 (D.C. Cir. 2014) ......................................................................................20, 21

*Burnett v. Sharma*,
   511 F. Supp. 2d 136 (D.D.C. 2007).....................................................................................24

**TABLE OF AUTHORITIES**
(continued)

Page

*Busby v. Capital One, N.A.*,
932 F. Supp. 2d 114 (D.D.C. 2013) ........................................................................... 33

*Cal. Democratic Party v. Jones*,
530 U.S. 567 (2000) ................................................................................... 18, 19, 30

*Cierco v. Mnuchin*,
857 F.3d 407 (D.C. Cir. 2017) ................................................................................ 7

*De La Fuente v. S.C. Democratic Party*,
No. 3:16-CV-00322-CMC, 2017 WL 3085750 (D.S.C. July 20, 2017) ........................ passim

*Democratic Party of U. S. v. Wis. ex rel. La Follette*,
450 U.S. 107 (1981) ........................................................................................ 18, 30

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006) ......................................................................................... 24

*Duffy v. Duffy*,
881 A.2d 630 (D.C. 2005) ................................................................................ 13

*Equity Grp., Ltd. v. Painewebber Inc.*,
839 F. Supp. 930 (D.D.C. 1993), *aff'd*, 48 F.3d 1285 (D.C. Cir. 1995) ..................... 14

*Eu v. San Francisco Cty. Democratic Cent. Comm.*,
489 U.S. 214 (1989) ........................................................................................ 18

*Garcia v. Santa Maria Resort*,
528 F. Supp. 2d 1283, 1295 (S.D. Fla. 2007) ...................................................... 34

*Gottlieb v. Fed. Election Comm'n*,
143 F.3d 618 (D.C. Cir. 1998) ......................................................................... 12

*Grand Lodge of Fraternal Order of Police v. Ashcroft*,
185 F. Supp. 2d 9 (D.D.C. 2001) ........................................................................ 6

*Granfield v. Catholic Univ. of Am.*,
530 F.2d 1035 (D.C. Cir. 1976) ...................................................................... 22

*Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*,
341 F.3d 1292 (11th Cir. 2003) ......................................................................... 34

*Haney v. Marriott Int'l, Inc.*,
No. 05-2501 (JDB), 2007 WL 2936087 (D.D.C. Oct. 9, 2007) ............................... 16

## TABLE OF AUTHORITIES
### (continued)

Page

*In re U.S. Office Prods. Co. Sec. Litig.,*
251 F. Supp. 2d 58 (D.D.C. 2003) ..............................................................................9, 10, 21

*Johnson v. U.S. Office of Pers. Mgmt,*
783 F.3d 655 (7th Cir. 2015) ..............................................................................12

*Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.,*
870 A.2d 58 (D.C. 2005) ..............................................................................16

*K St. Developers, LLC v. Teachers Ins. & Annuity Ass'n of Am.,*
69 F. Supp. 3d 45 (D.D.C. 2014) ..............................................................................9

*Kerrigan v. Britches of Georgetowne, Inc.,*
705 A.2d 624 (D.C. 1997) ..............................................................................20

*Koker v. Aurora Loan Servicing,*
915 F. Supp. 2d 51 (D.D.C. 2013) ..............................................................................11

*Ladd v. Chemonics Int'l, Inc.,*
603 F. Supp. 2d 99 (D.D.C. 2009) ..............................................................................15

*Lagayan v. Odeh,*
199 F. Supp. 3d 21 (D.D.C. 2016) ..............................................................................6, 9

*Lattisaw v. D.C.,*
118 F. Supp. 3d 142 (D.D.C. 2015) ..............................................................................30

*Lewis v. Full Sail, LLC,*
266 F. Supp. 3d 320 (D.D.2. 2017) ..............................................................................32

*Lifeline, Inc. v.Bakari,*
107 F. Supp. 3d 38 (D.D.C. 2015) ..............................................................................7

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ..............................................................................7, 9, 12

*Malek v. Flagstar Bank,*
70 F. Supp. 3d 23 (D.D.C. 2014) ..............................................................................34

*Malone v. Saxony Co-op. Apartments, Inc.,*
763 A.2d 725 (D.C. 2000) ..............................................................................13

*McKane v. Adams,*
123 N.Y. 609 (1890) ..............................................................................18

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Melott v. ACC Operations, Inc.*,
   No. 2:05-CV-063, 2006 WL 1892656 (S.D. Ohio July 10, 2006)..........................................10

*Mero v. City Segway Tours of Washington DC, LLC*,
   826 F. Supp. 2d 100 (D.D.C. 2011)..........................................................................22

*Mesumbe v. Howard Univ.*,
   706 F. Supp. 2d 86 (D.D.C. 2010)............................................................................25

*Miller v. Bridgeport Bd. of Educ.*,
   No. 3:12-CV-01287 VLB, 2014 WL 1117790 (D. Conn. Mar. 19, 2014) ............................24

*Morris v. Carter Glob. Lee, Inc.*,
   997 F. Supp. 2d 27 (D.D.C. 2013) ...............................................................23, 24, 28

*\*Myers v. Alutiiq Int'l Sol., LLC*,
   811 F. Supp. 2d 261 (D.D.C. 2011).......................................................................21, 22

*PCH Mut. Ins. Co. v. Cas. & Sur., Inc.*,
   750 F. Supp. 2d 125 (D.D.C. 2010).........................................................................14

*Pender v. Bank of Am. Corp.*,
   No. 3:05-CV-00238-GCM, 2016 WL 7320894 (W.D.N.C. Dec. 15, 2016) .........................26

*Perles v. Kagy*,
   362 F. Supp. 2d 195 (D.D.C. 2005), *aff'd in part, vacated in part on other*
   *grounds* 473 F.3d 1244 (D.C. Cir. 2007)...............................................................8, 16

*Pope v. Bond*,
   641 F. Supp. 489 (D.D.C. 1986).............................................................................27

*Rafferty v. NYNEX Corp.*,
   744 F. Supp. 324 (D.D.C. 1990) *aff'd*, 60 F.3d 844 (D.C. Cir. 1995).....................................15

*RDP Techs., Inc. v. Cambi AS*,
   800 F. Supp. 2d 127 (D.D.C. 2011).........................................................................14

*Rosenthal v. Nat'l Produce Co.*,
   573 A.2d 365 (D.C. 1990) ...............................................................................9, 10

*Ryan v. BuckleySandler, LLP*,
   69 F. Supp. 3d 140 (D.D.C. 2014)........................................................................11, 14

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Schaffer v. Clinton*,
240 F.3d 878 (10th Cir. 2001) .........................................................................................12

*Sheppard v. District of Columbia*,
791 F. Supp. 2d 1 (D.D.C. 2011) .....................................................................................26

*St. Croix v. Genentech, Inc.*,
No. 8:12-cv-891-T-33EAJ, 2012 WL 2376668 (M.D. Fla. June 22, 2012) ......................27

*St. John's United Church of Christ v. FAA*,
550 F.3d 1168 (D.C. Cir. 2008) .......................................................................................18

*\*Stansel v. Am. Sec. Bank*,
547 A.2d 990 (D.C. 1988) ...........................................................................................9, 10

*Steele v. Johnson*,
458 P.2d 889 (Wash. 1969).............................................................................................17

*Steuart Inv. Co. v. The Meyer Grp., Ltd.*,
61 A.3d 1227 (D.C. 2013) ..............................................................................................8

*\*Strauss v. NewMarket Glob. Consulting Grp., LLC*,
5 A.3d 1027 (D.C. 2010) ...........................................................................................9, 15

*Sundberg v. TTR Realty, LLC*,
109 A.3d 1123 (D.C. 2015) .............................................................................................32

*\*Swanson v. Pitt*,
330 F. Supp. 2d 1269 (M.D. Ala. 2004) ......................................................................17, 18

*U.S. ex rel. Joseph v. Cannon*,
642 F.2d 1373 (D.C. Cir. 1981) .......................................................................................32

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*,
389 F.3d 1251 (D.C. Cir. 2004) .......................................................................................32

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*,
463 U.S. 825 (1983) (Blackmun, J. dissenting)...........................................................27, 31

*United House of Prayer for All People v. Therrien Waddell, Inc.*,
112 A.3d 330 (D.C. 2015) .........................................................................................8, 13, 15

*United States v. Philip Morris USA, Inc.*,
No. CIV.A.99-2496(GK), 2004 WL 5355971 (D.D.C. Aug. 2, 2004)................................4, 34

# TABLE OF AUTHORITIES
## (continued)

Page

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982)......................................................................................................7

*Vereen v. Clayborne*,
  623 A.2d 1190 (D.C. 1993) .........................................................................................15

*Ward v. TheLadders.com, Inc.*,
  3 F. Supp. 3d 151 (S.D.N.Y. 2014) ..............................................................................9

*West Virginia v. U.S. Dep't of Health & Human Servs.*,
  145 F. Supp. 3d 94 (D.D.C. 2015) *aff'd*, 827 F.3d 81 (D.C. Cir. 2016)...................12

*William F. Klingensmith, Inc. v. D.C.*,
  370 A.2d 1341 (D.C. 1977) ...................................................................................11, 14

*Willmott v. Nat'l R. Passenger Corp.*,
  No. 81-0811 JGP, 1991 U.S. Dist. LEXIS 1208 (D.D.C. Jan. 31, 1991) .................20

*Wilson v. DNC Services Corp.*,
  Case No. 1:17-cv-00730-TNM (filed Jan. 2, 2018)....................................1, 2, 9, 13

*Zoob v. Jordan*,
  841 A.2d 761 (D.C. 2004) ...........................................................................................15

STATUTES

28 U.S.C.A. § 1654.................................................................................................................1

42 U.S.C. 2000d et seq..........................................................................................................4

42 U.S.C. § 1981(b) .............................................................................................................23

42 U.S.C. § 1985(3) ......................................................................................................passim

OTHER AUTHORITIES

Federal Rules of Civil Procedure Rule 12(b)(6) ...........................................................1, 6

Defendants DNC Services Corporation d/b/a Democratic National Committee and its former chairperson U.S. Congresswoman Deborah Wasserman Schultz (together, "Defendants" or the "DNC"),[1] respectfully move to dismiss the Complaint, filed by Roque "Rocky" De La Fuente ("De La Fuente") and Rocky De La Fuente 2016's presidential campaign (the "De La Fuente Campaign") (collectively, "Plaintiffs"),[2] with prejudice, under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In addition, Count I of the Complaint should separately be dismissed for lack of standing, pursuant to Rule 12(b)(1). Finally, Plaintiffs' racial discrimination claim (Count III) is based in large part on a claim that has already been litigated before, and rejected by, a federal court, raising issue preclusions issues. In support of their Motion, Defendants submit as follows.

## I.      INTRODUCTION

Plaintiffs pursue novel legal theories that are unsupported by precedent and, in the particular context in which they arise—i.e., in an action by an unsuccessful political candidate against the political party committee with whom that candidate self-identifies—would run contrary to the First Amendment. Boiled down to its most basic, De La Fuente's argument is that his failure to mount a successful presidential campaign was the result of a vaguely outlined conspiracy orchestrated by the Defendants. This theme permeates the Complaint, which fails to make concrete or plausible allegations that could, as a matter of law, give rise to liability.[3] The

---

[1] Each of the claims in the Complaint are alleged against both the DNC and Congresswoman Wasserman Schultz, and all are based on conduct that Plaintiffs contend took place during the Congresswoman's tenure as Chairperson of the DNC. Compl., ECF No. 1 at ¶ 8. Thus, the motion addresses the claims against the Defendants as they are pled, collectively. Generally speaking, Plaintiffs' claims fail all the more so as against the Congresswoman in that the Complaint fails to plead facts plausibly stating any claims against her (e.g., that *she* entered into any type of contract).

[2] De La Fuente brings this lawsuit "*pro se*" on behalf of himself and the De La Fuente Campaign. "Although a plaintiff may appear *pro se* on his own behalf, he may not represent other *pro se* plaintiffs in federal court." *Ali v. U.S. Parole Comm'n*, No. CIV.A.06 0235(RCL), 2007 WL 902312, at *4 (D.D.C. Mar. 23, 2007); *see also* 28 U.S.C.A. § 1654. Thus, the claims brought by the Campaign are also separately subject to dismissal on this basis.

[3] The Complaint borrows heavily from a similar action filed earlier this year also in the U.S. District Court for the District of Columbia, *Wilson v. DNC Services Corp.*, Case No. 1:17-cv-00730-TNM (filed Jan. 2, 2018), 2d Am. Compl., ECF No. 25. In fact, De La Fuente's Complaint includes several of the same claims and allegations asserted in the *Wilson* complaint,

DNC denies any inappropriate conduct in the 2016 presidential election, but even viewing the Complaint in the light most favorable to Plaintiffs, as is appropriate in the context of a motion to dismiss, Plaintiffs have failed to plead facts sufficient to maintain this litigation.

*First*, Plaintiffs seek to expand the boundaries of existing contract law well beyond precedent, asking the Court to recognize a binding contractual relationship between a candidate and a political party based upon the candidate's unilateral decision to run for office and the existence of internal political party rules voluntarily adopted by the party long before Plaintiffs sought the presidency. Dismissal is appropriate not only because of black letter contract law, but also because of the serious First Amendment issues that would arise if such an action could be maintained. Plaintiffs also fail to allege a sufficient basis for standing to pursue this claim. *Second*, Plaintiffs' promissory estoppel claim cannot be maintained, because the "promises" that Plaintiffs claim gave rise to legally enforceable obligations are, at best, vague and undefined and, as such, not cognizable. *Third*, Plaintiffs' Section 1981 claim must be dismissed because it is based on entirely speculative and conclusory allegations. Indeed, a federal court has already rejected substantially similar claims by De La Fuente in litigation brought against a state Democratic party during the course of the 2016 presidential campaign. Thus, the doctrine of issue preclusion also weighs in favor of dismissing this claim. *Fourth*, Plaintiffs' Section 1985 claim must be dismissed because the Complaint fails to plausibly allege any conspiracy involving civil rights. *Finally*, Plaintiffs' fraud and negligent misrepresentation claims (which identify no statements that Plaintiffs could reasonably rely upon as a matter of law) should be dismissed because they are neither plausible nor pled with particularity, as required by Rule 9(b).

Because Plaintiffs have not asserted any cognizable claims, and because any further amendment would be futile, Defendants move for dismissal with prejudice.

---

often word-for-word. The *Wilson* case is pending on a motion to dismiss. *See* Mot. to Dismiss Pls.' 2d Am. Compl., ECF No. 26.

## II.    BACKGROUND[4]

De La Fuente is a resident of California, "a successful Mexican-American entrepreneur, businessman and real estate developer." Compl., ECF No. 1 at ¶ 5. On October 1, 2015, the Federal Elections Commission ("FEC") formally accepted the registration of the De La Fuente Campaign for the office of President of the United States. *Id.* at ¶ 24.[5] The Statement of Candidacy filed with the FEC indicated that De La Fuente's party affiliation was Democratic. *Id.* at ¶ 9.

In December 2015, Plaintiffs sent a letter to the DNC, stating that De La Fuente intended to seek the Democratic Party's nomination for President, and that Plaintiffs had registered with the FEC. *Id.* The letter "sought campaign support and general information on the Democratic Party's nominating process." *Id.* at ¶ 13. The Complaint alleges that the DNC's then-CEO Amy Dacey responded and "provided Plaintiffs [with] the Rules on Delegate Selection, the Delegate Allocation Chart and promised to provide assistance . . . through introductions to State Party officials, logistical resources, and general political assistance for his Presidential campaign." *Id.* at ¶ 15. The Complaint does not provide further details about these communications or the purported promises that Plaintiffs allege they contained. Nevertheless, De La Fuente claims that he "expressly relied on Ms. Dacey's promises and representations in moving forward with his Presidential campaign and [his] personal expenditure of $6,690,522.37 on his 2016 Democratic Presidential nomination campaign." *Id.* ¶ 16.

The Complaint alleges that, "[d]espite [his] relatively late entry into" the race, De La Fuente attained "sufficient grass-roots support to appear on the primary and/or caucus ballots in 36 states and territories." *Id.* at ¶ 17. It is not clear from the Complaint how long De La Fuente campaigned or precisely what Plaintiffs did to further De La Fuente's campaign for President, but, ultimately, his bid for the Democratic nomination was not successful. His best performance

---

[4] Except where otherwise noted, the facts recited here are the facts as alleged in the Complaint, accepted as true only for the purposes of this motion to dismiss.
[5] The Complaint cites to various exhibits purportedly filed in support of its allegations, but no exhibits were attached to the Complaint as filed. *See generally* ECF No. 1.

was in Delaware, where he received 1.09% of the vote; in all of the other states where he appeared on the ballot he received less than 1% of the vote. *See* Declaration of Elisabeth C. Frost In Supp. of Mot. to Dismiss ("Frost Decl."), Ex. A, FEC, Federal Elections 2016 at 47-68 (updated Dec. 2017).[6] In June 2016, De La Fuente established the American Delta Party, after which he pursued and received the Reform Party's nomination in August 2016. *See* Frost Decl., Ex. B, Press Release, The Reform Party, The Reform Party Nominates Roque De La Fuente and Returns to Form (Aug. 9, 2016).

During the course of his bid for the 2016 Democratic nomination for president, De La Fuente sued the South Carolina Democratic Party (the "SCDP") "seeking declaratory and injunctive relief . . . [that] the decision of the [SCDP] not to include him on the list of approved candidates to appear on the Presidential Primary Ballot [in South Carolina] was 'unconstitutional and violative of the 14th Amendment to the United States Constitution and violates 42 U.S.C. 2000d et seq.'" *De La Fuente v. S.C. Democratic Party*, No. 3:16-CV-00322-CMC, 2017 WL 3085750, at *1 (D.S.C. July 20, 2017) (quoting complaint). At issue in that case was the decision of the SCDP not to include De La Fuente on South Carolina's primary ballot as a Democratic candidate for President based on its conclusion that De La Fuente "did not have nationwide recognition as a viable presidential candidate, and had not campaigned in South Carolina." *Id*. The SCDP also declined to certify "[a]t least one other candidate" for certification on the ballot that year: "Lloyd Kelso, a Caucasian from North Carolina[.]" *Id*. De La Fuente argued that his exclusion was a violation of due process, and that the SCDP had discriminated against him on the basis of national origin, in violation of the Civil Rights Act and the Fourteenth Amendment. *Id*. at *2. The court rejected both claims, granting the SCDP's motion for summary judgment.

---

[6] The Court may take judicial notice of the results of the Democratic presidential primaries, including De La Fuente's performance in states where he appeared on the ballot. *See United States v. Philip Morris USA, Inc.*, No. CIV.A.99-2496(GK), 2004 WL 5355971, at *1 (D.D.C. Aug. 2, 2004) ("Judicial notice may be taken of historical, political, or statistical facts, or any other facts that are verifiable with certainty."). Defendants cite this and a handful of other facts of which the Court may take judicial notice not because the Court need rely upon these facts in order to grant the motion to dismiss, but rather to provide useful context and to illustrate why, in this particular case, the circumstances are such that amendment would be futile.

First, the court found that it was well established that there is a legitimate right "'to restrict access to primary ballots . . . as a . . . means of preventing candidates who have not even a minimal degree of voter support from appearing on the ballot," so as to "reduce[] waste and confusion by excluding . . . frivolous candidates.'" *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 78-89, n.9 (1983)). The court further found that, in De La Fuente's case, "[i]t is undisputed that [he] had no actual, non-electronic presence in South Carolina," and even then, his only contact with the state was "through a Facebook page—one not even directed specifically at South Carolina, but a general campaign page." *Id.* at *3. Indeed, he "testified at deposition [that] he had only been to South Carolina four times in conjunction with his 2016 presidential campaign—two of which were his court and deposition appearances for this case[.]" *Id.* at *3. He further "conceded he had no endorsements by elected officials or clergy in South Carolina and did not distribute any printed campaign materials in South Carolina[.]" *Id.* The court further found that the SCDP's conclusion that De La Fuente also lacked national visibility was not arbitrary, given that De La Fuente was unable to point to a single news article that "indicate[d] [he] was actually a viable candidate for President." *Id.* at *4.

As for De La Fuente's discrimination claim, it was remarkably similar to the one that he alleges in the instant case: specifically, De La Fuente argued that "SCDP denied his request to be on the ballot because of the 'political and electoral threat that plaintiff's Hispanic heritage posed to Hillary Clinton.'" *Id.* (quoting plaintiff's brief). However, the court found that De La Fuente "offer[ed] no factual support for this claim other than an assertion in his deposition [that] SCDP discriminated against him because he is Hispanic, and offers as evidence the prior outcomes of elections." *Id.* Finding this clearly insufficient to succeed on his intentional discrimination claims, the court granted summary judgment to the SCDP on this issue, as well. *Id.*

On February 20, 2018, nearly a year and a half after the July 2016 Democratic National Convention at which hundreds of Democratic delegates from all over the country convened in Philadelphia to select the party's 2016 presidential nominee, and over a year after the 2016 General Election, Plaintiffs filed the instant Complaint, which sets forth De La Fuente's theory

as to why he was not successful in his attempt to obtain the Democratic nomination, for which he blames Defendants. To this end, he alleges six counts: (1) breach of "implied-in-fact" contract (Count I, Compl. ¶¶ 88-95), (2) promissory estoppel (Count II, Compl. ¶¶ 96-104), (3) race discrimination (Count III, Compl. ¶¶ 105-117), (4) civil conspiracy (Count IV, Compl. ¶¶ 119-125), (5) fraud (Count V, Compl. ¶¶ 125-32), and (6) negligent misrepresentation (Count VI, Compl. ¶¶ 133-141).

Plaintiffs seek "[c]ompensatory damages in an amount in excess of $6,000,000 . . . but in no event less than all amounts expended by Plaintiffs in pursuit of the 2016 Democratic Party Presidential nomination," "[p]unitive damages" of "no … less than $1,000,000," Plaintiffs' costs and "reasonable" attorney fees, undefined "[a]ppropriate equitable relief," and any other relief the Court deems necessary. *Id.* at 45.

## III.   STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). Plaintiffs must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Though "[t]he factual allegations in the complaint need not be 'detailed,'" a complaint cannot survive a motion to dismiss if it simply asserts "'unadorned, the-defendant-unlawfully-harmed-me accusation[s].'" *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 26 (D.D.C. 2016) (quoting *Iqbal*, 556 U.S. at 678). Courts need only accept well-pleaded, factual allegations as true—construing them in the light most favorable to the non-moving party—but the same courtesy does not extend to statements of law, "mere conclusory statements," or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

"Under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13

(D.D.C. 2001) (citation omitted); *see also Lifeline, Inc. v.Bakari*, 107 F. Supp. 3d 38, 39 (D.D.C. 2015) ("[A] court should begin with a presumption that a case lies outside this jurisdiction.") (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Federal courts are limited to adjudicating "cases" and "controversies." U.S. Const. art. III, § 2. Central to that requirement is standing. To avoid dismissal on standing grounds, a plaintiff must show that (1) he has "suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," (2) the injury "fairly can be traced to the challenged action," and (3) the injury "is likely to be redressed by a favorable decision." *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982); *see also Lujan*, 504 U.S. at 560-561. Failure to allege any of these elements leaves a plaintiff without standing, and the court without jurisdiction. *See Cierco v. Mnuchin*, 857 F.3d 407, 419 (D.C. Cir. 2017).

## IV.    ARGUMENT

The Complaint must be dismissed in its entirety because it fails to allege any facts that entitle Plaintiffs to relief as a matter of law, on any of the claims that it asserts.

### A.    Count I (Breach of Implied Contract) Should Be Dismissed.

Plaintiffs assert two novel theories, neither of which can sustain their claim for breach of implied contract beyond a motion to dismiss. *First*, Plaintiffs incorrectly and absurdly suggest that an implied contract is created every time an individual decides to run for office in a political party's primary and the party provides him with corresponding standard information. *See* Compl., ¶ 54. *Second*, Plaintiffs allege that an implied contract of "neutrality" arose between them and the DNC as a result of Plaintiffs' "awareness" of Article 5, Section 4 of the DNC Charter, which provides that the Chairperson of the DNC "shall exercise impartiality and evenhandedness as between the Presidential candidates and campaigns …. during the Democratic Party Presidential nominating process." *Id.* at ¶¶ 28, 31, 32, 34. Both theories conflict with basic requirements of contract law and cannot be sustained as a matter of law. Moreover, serious First Amendment concerns would arise if either were to be recognized as

actionable. Further, Plaintiffs fail to allege facts which, even if true, could establish a basis for standing to pursue this claim.

     **1.**    **Plaintiffs Fail to Plausibly Allege that an Implied Contract Existed between the Parties.**

Plaintiffs' breach of contract claim fails for a simple and basic reason: the Complaint does not plead facts, which, if true, could establish an implied contract between Plaintiffs and the DNC as a matter of law. An implied-in-fact contract, which is a contract that is not written, nor expressed orally, but is inferred from the conduct of the parties in light of the circumstances, must contain all necessary elements of a binding agreement. *See Steuart Inv. Co. v. The Meyer Grp., Ltd.*, 61 A.3d 1227, 1233 (D.C. 2013) (citing *Vereen v. Clayborne*, 623 A.2d 1190, 1193 (D.C. 1993)). Specifically, it must contain: (1) [an] agreement as to all material terms; and (2) [an] intention of the parties to be bound. *United House of Prayer for All People v. Therrien Waddell, Inc.*, 112 A.3d 330, 337-38 (D.C. 2015) (quoting *Georgetown Entm't Corp. v. D.C.*, 496 A.2d 587, 590 (D.C. 1985)). Further, under D.C. law, an implied contract must contain four additional elements: (1) that valuable services were rendered, (2) to the person from whom recovery is sought, (3) which services were accepted by that person, and (4) under such circumstances as reasonably notified the person that the plaintiff expected to be paid by that person. *See Perles v. Kagy*, 362 F. Supp. 2d 195, 198 (D.D.C. 2005), *aff'd in part, vacated in part on other grounds* 473 F.3d 1244 (D.C. Cir. 2007) (citing *Vereen*, 623 A.2d at 1193).

Plaintiffs' breach of implied contract claim fails because the Complaint: (1) does not plausibly allege that there was agreement between the parties to all material terms of the purported contract; (2) does not plausibly allege that the parties intended to be bound by those terms; (3) does not allege, beyond mere conclusory allegations, that Plaintiffs have standing to assert such a claim; and (4) does not plausibly allege the other required elements of an implied contract under District of Columbia law.

a. **Plaintiffs Fail to Plausibly Allege that There Was Agreement Between the Parties on Most Basic Material Terms of the Purported Contract.**

Plaintiffs' breach of contract claim is insufficient as a matter of law, because they have not plausibly alleged that there was agreement between them and the DNC on basic material terms. It is a black letter rule of contract law that for a breach of contract claim to be adequately alleged, a complainant must clearly and plausibly allege what each of the parties to the contract is bound to do. *See Strauss v. NewMarket Glob. Consulting Grp., LLC*, 5 A.3d 1027, 1033 n.3 (D.C. 2010) (describing rule that a court cannot enforce a contract unless it can determine what parties have contracted to do); *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990) (describing "material terms" as "promises and performance to be rendered by each party").[7]

The Complaint falls far short of providing any details of the purported contract, failing even to plausibly allege the terms to which the parties agreed, much less clearly and plausibly allege what the *DNC* purportedly failed to do. It is well-established that allegations of vague and indefinite terms cannot give rise to an enforceable contract as a matter of law. *See Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 163 (S.D.N.Y. 2014) (holding phrase "terms and conditions" was "vague" and "legally insufficient" to establish a contract); *see also K St. Developers, LLC v. Teachers Ins. & Annuity Ass'n of Am.*, 69 F. Supp. 3d 45, 54 (D.D.C. 2014) ("The 'material terms' (such as subject matter, price, payment terms, and duration) must be 'sufficiently definite' so that each party can be 'reasonably certain' about what it is promising to do or how it is to perform."); *In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 58, 71 (D.D.C. 2003) (describing "material terms" as including "price, payment terms, duration, and the identity of the parties involved"); *Strauss*, 5 A.3d at 1033 (finding agreement not binding when party failed to prove material terms necessary for parties to understand how to perform the contract); *Stansel v. Am. Sec. Bank*, 547 A.2d 990, 993 (D.C. 1988) (finding no enforceable

---

[7] Because Plaintiffs fail to plausibly allege any non-conclusory allegations linking their alleged injury to the conduct of the DNC, they also have not established that they have standing to pursue this claim. *See Lagayan*, 199 F. Supp. 3d at 26 (quoting *Iqbal*, 556 U.S. at 678); *see also Lujan*, 504 U.S. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)) (requiring "the injury [] to be 'fairly . . . trace[able] to the challenged action of the defendant'").

contract where parties failed to offer "evidence of any specific terms of the alleged agreement, such as the exact amount of the loans, the interest rates, terms of payment, or manner of performance"). The Complaint falls far short on this front.

*First*, the Complaint sets forth the vague allegation that the DNC was required to provide "logistical assistance, guidance, [and] resources to [Plaintiffs]," but this is insufficiently specific to support an implied contract claim. Compl., at ¶ 33. The Complaint fails entirely to specify what it means by "guidance," "logistical assistance," or "resources," all terms that could mean any number of different things to different people. *See Melott v. ACC Operations, Inc.*, No. 2:05-CV-063, 2006 WL 1892656, at *5 (S.D. Ohio July 10, 2006) (holding "offer to assist" as "vague" and insufficient to constitute a binding contract); *see also Stansel*, 547 A.2d at 993 (finding no enforceable contract where parties failed to offer "evidence of any specific terms of the alleged agreement, such as the exact amount of the loans, the interest rates, terms of payment, or manner of performance"); *In re U.S. Office Prods.*, 251 F. Supp. 2d at 72 (requiring "material terms" to "not be vague or indefinite"); *Rosenthal*, 573 A.2d at 369-370 (holding material terms of a contract cannot be indefinite).

*Second*, Plaintiffs allege that the DNC "promised Plaintiff De La Fuente that it would introduce him to the political leadership in state Democratic Party committees," but this also does not allege a valid contractual term. Compl., at ¶ 49. As the D.C. Circuit has previously held, such a "promise" cannot support an enforceable implied contract. *See Bloomgarden v. Coyer*, 479 F.2d 201, 209 (D.C. Cir. 1973) (holding no implied contract based on one party's introduction of two individuals, as an introduction would not "have put [anyone] on notice" consideration was expected for such services).

*Third*, Plaintiffs allege that a "significant DNC resource" provided to candidates "was access to the DNC's Voter Data File System," Compl., at ¶ 58, but this allegation does not support a claim for implied contract between the DNC and the Plaintiffs. Tellingly, the Complaint sets forth no allegations that the DNC specifically promised *Plaintiffs* access to the Voter Data File System. *See generally id*. If anything, it implicitly admits that no such promise

was ever made. *Id.* at ¶ 61 (alleging the DNC "never responded to Plaintiff De La Fuente's request for access to the DNC Voter Data File"). The Complaint does not allege that either Plaintiffs or the DNC made any mention of the DNC's Voter File data in their correspondence. *Id.* at ¶ 15. Plaintiffs' allegations are plainly inadequate to support this claim. *See, e*.g., *Ryan v. BuckleySandler, LLP*, 69 F. Supp. 3d 140, 147 (D.D.C. 2014) (granting motion to dismiss in regards to alleged contract based on silence); *William F. Klingensmith, Inc. v. D.C.*, 370 A.2d 1341, 1344 (D.C. 1977) (holding no contract due to silence).

The Complaint's allegation that the DNC breached its Charter by failing to act neutrally also cannot support this claim, as a matter of law, not least of all because Plaintiffs fail to plausibly allege that the DNC did not act impartially or neutrally. In support, the Complaint cites: (1) a memorandum that was not authored by the DNC, Compl., at ¶¶ 64-71, (2) a quote by a former DNC chair expressing disapproval of statements purportedly made about Senator Bernie Sanders in unidentified DNC emails, *see id*. at ¶ 72, and (3) demonstrably false allegations about a "secret" legal joint funding agreement, *id*. at ¶ 74 (*see* discussion *infra*). But none of these allegations actually support Plaintiffs' contention that the DNC did not act impartially or neutrally in the primary process. For example, the allegation that an unidentified individual or organization sent a memorandum *to* the DNC in May 2015 that "focused on the general election campaign for Hillary Clinton," is misplaced for several reasons, but most obviously because the DNC was *not the author* and does not control what others send it. *Id.* at ¶ 66. Similarly, a quote by a former DNC chair expressing disapproval of statements purportedly made about Senator Sanders in an unidentified email, *see id.* at ¶ 72, is not a plausible basis upon which the DNC could be found to have not acted with neutrality.

As for Plaintiffs' allegations that the DNC "secretly" entered into a joint funding relationship with Secretary Clinton, that assertion is demonstrably false as a matter of public record: the DNC publicly disclosed the existence of that joint fundraising committee in disclosures filed with the FEC as early as September 18, 2015. *See* Frost Decl., Ex. C, DNC's Statement of Organization, FEC Form 1, at 3 (Sept. 18, 2015); *see also Koker v. Aurora Loan*

*Servicing*, 915 F. Supp. 2d 51, 58 (D.D.C. 2013) (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)) ("[A]mong the documents 'subject to judicial notice on a motion to dismiss' are 'public records.'"). Rank speculation cannot sustain a complaint beyond the motion to dismiss stage.

Plaintiffs' attempt to build a breach of implied contract claim on the DNC Charter also fails as a matter of law, because the Complaint does not sufficiently allege that Plaintiffs suffered cognizable injury as a result of any alleged failure to comply with the Charter. Plaintiffs baldly allege they suffered "great economic harm," Compl., at ¶ 95, but fail to assert any non-conclusory link between a purported failure to comply with the Charter and any harm allegedly suffered by Plaintiffs, and therefore, do not have standing to assert this claim. *See Lujan*, 504 U.S. at 560 (requiring "the injury [] to be 'fairly . . . trace[able] to the challenged action of the defendant'") (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). Moreover, any allegation of political harm would not be a sufficient injury for standing purposes. *See, e.g., Johnson v. U.S. Office of Pers. Mgmt*, 783 F.3d 655, 668-669 (7th Cir. 2015) (holding that political harm "is insufficient to establish standing"); *Schaffer v. Clinton*, 240 F.3d 878, 886 (10th Cir. 2001) (same); *see also Gottlieb v. Fed. Election Comm'n*, 143 F.3d 618, 620, 621 (D.C. Cir. 1998) (holding no cognizable injury based on "suffer[ing] a diminution in [] ability to influence the political process," or a preferred candidate being placed at a disadvantage, because such theories necessarily "rest[] on gross speculation and [are] far too fanciful to merit treatment as an 'injury in fact'"); *West Virginia v. U.S. Dep't of Health & Human Servs.*, 145 F. Supp. 3d 94, 103 (D.D.C. 2015) (holding "consequential harm in the form of increased or enhanced 'political accountability' is simply too abstract to support standing") *aff'd*, 827 F.3d 81 (D.C. Cir. 2016). Thus, this claim cannot survive a motion to dismiss under Rule 12(b)(1), either.

The allegations as to what consideration Plaintiffs exchanged in reliance on the DNC's alleged promises are similarly vague, with the Complaint asserting only that Plaintiffs agreed to be bound by unidentified "campaign conditions, rules, and regulations," established by the DNC. *Id*. at ¶ 39. However, the only "rules" and "regulations" that Plaintiffs identify are contained in

Article 5, Section 4 of the Charter of the Democratic Party, but, as Plaintiffs implicitly acknowledge by their allegations in the Complaint, that provision contains no contractually enforceable obligations that could plausibly support Plaintiffs' claim that an implied contract existed. Rather, Section 4 discusses the responsibilities and compensation of the DNC's national Chairperson, with a general reference to expectations the *DNC* has of the *Chairperson*. *See id*. at ¶ 28 ("The National Chairperson shall serve full time and shall receive such compensation as may be determined by agreement between the Chairperson and the Democratic National Committee," and, "[i]n the conduct and management of the affairs and procedures of the Democratic National Committee … the Chairperson shall exercise impartiality and evenhandedness as between the Presidential candidates and campaigns."). This cannot logically constitute terms to which *Plaintiffs* were bound.

Thus, Plaintiffs' breach of implied contract claim fails at the outset, because it does not adequately clearly allege the material terms to which the parties purportedly agreed to be bound.

### b. Plaintiffs Fail to Plausibly Allege that Either Party Intended to Be Bound by a Contract.

Plaintiffs' breach of contract claim should also be dismissed because the facts alleged in the Complaint do not plausibly support a finding that either party intended to be bound by an implied contract. For an enforceable contract to exist, there must be an "intention of the parties to be bound." *United House of Prayer*, 112 A.3d at 337-38 (quoting *Georgetown Entm't*, 496 A.2d at 590). "The intentions of parties to a contract can be found from written materials, oral expressions, and the actions of the parties." *Duffy v. Duffy*, 881 A.2d 630, 637 (D.C. 2005).

Here, there are no plausible allegations that the parties intended to be bound to an implied agreement, as evidenced by the lack of allegations that the DNC and Plaintiffs even discussed, much less agreed to, terms. Courts have granted motions to dismiss based on failure to plead facts suggesting that the parties ever discussed their alleged obligations under a purported contract. *See Malone v. Saxony Co-op. Apartments, Inc.*, 763 A.2d 725, 729 (D.C. 2000) ("'The failure to agree on or even discuss an essential term of a contract may indicate that the mutual

assent required to make or modify a contract is lacking."') (quoting *Owen v. Owen*, 427 A.2d 933, 937 (D.C. 1981)); *see also BuckleySandler*, 69 F. Supp. 3d at 147 (granting motion to dismiss breach of contract claim due to alleged contract based on silence); *William F. Klingensmith*, 370 A.2d at 1344 (holding no contract due to silence).

The Complaint fails to plausibly allege that the DNC offered and Plaintiffs accepted specific "terms and conditions" necessary for contract formation. *See RDP Techs., Inc. v. Cambi AS*, 800 F. Supp. 2d 127, 141 (D.D.C. 2011) ("The Court must look closely at the parties' intentions to determine whether there has been a meeting of the minds, and hence whether a contract exists."). For instance, where parties attach different meanings to a term, "and neither party had reason to know of the meaning attached by the other, 'neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.'" *PCH Mut. Ins. Co. v. Cas. & Sur., Inc.*, 750 F. Supp. 2d 125, 145 (D.D.C. 2010) (quoting Restatement (Second) of Contracts § 201(3) (1981)). Such is the case at hand: the DNC's provision of materials and offers of general assistance, without more, does not indicate an assent, shared with De La Fuente, to specific terms and conditions. Rather, "[P]laintiff[s] seek[] to imply the existence of a contract based on the mere fact that the parties … engaged in informal discussions," but "a reasonable person would not believe that such discussions manifested an intent to be bound." *Equity Grp., Ltd. v. Painewebber Inc.*, 839 F. Supp. 930, 934 (D.D.C. 1993), *aff'd*, 48 F.3d 1285 (D.C. Cir. 1995). Plaintiffs' description of the DNC's communications with De La Fuente show only—at the very most—a subjective intent to be bound *by De La Fuente*. *See* Compl., at ¶ 16 (describing De La Fuente's "reli[ance] on Ms. Dacey's promises"). Subjective reliance by one party alone, unjustified by the objective circumstances of the communication, does not create a contract between the parties.

The lack of any agreement is further demonstrated by Plaintiffs' implausible account as to how they manifested their intention to be bound. Plaintiffs allege that they agreed to be bound by a contract with a party with whom they had never communicated, and without knowing whether they would receive any benefit in return, stating that Plaintiffs agreed to be bound to

- 14 -

"conditions, rules and regulations" "[u]pon registering and qualifying as a national presidential Democratic candidate" in October 2015. *Id*. at ¶¶ 9-10, 39. Yet, Plaintiffs do not state that they ever even communicated with the DNC before De La Fuente allegedly accepted unidentified "terms and conditions" by declaring his candidacy. *See id.* To the contrary, the Complaint alleges that it was only *after* Plaintiffs claim to have agreed to be bound by the DNC's unspecified "rules and regulations" that they reached out to the DNC. *Id*. at ¶ 13. It is simply not plausible that Plaintiffs manifested an intent to be bound when De La Fuente declared his candidacy before having any communications with the DNC about the same, and the Complaint does not allege any objective manifestation of the Plaintiffs' intention to be bound after that point.[8]

The absence of the DNC's agreement to any implied contract is also evidenced by Plaintiffs' acknowledgment that the DNC customarily provides the information Plaintiffs sought to *all* "candidates contending for the party's presidential nomination," evidencing the gratuitous nature of the offer. *Id*. at ¶ 58. Courts have held that gratuitous promises are not contractually enforceable, because they lack consideration. *See, e.g*., *Rafferty v. NYNEX Corp.*, 744 F. Supp. 324, 330-31 (D.D.C. 1990) (holding defendant made gratuitous promise where it "did not ask [the plaintiff] to do anything in return for the promise, and [the plaintiff] made no offer to do so") *aff'd*, 60 F.3d 844 (D.C. Cir. 1995); *Zoob v. Jordan*, 841 A.2d 761, 765 (D.C. 2004) ("[A] mere promise to make a gift is unenforceable"); *Ladd v. Chemonics Int'l, Inc.*, 603 F. Supp. 2d 99, 120 (D.D.C. 2009) (determining that a "mere promise to pay" a former employee lacked consideration and thus constituted an "unenforceable gratuitous promise" under D.C. law);

---

[8] The fact that Plaintiffs do not allege any writing memorializing an agreement, when—as the Complaint acknowledges—the DNC commonly used written, formal contracts to memorialize its agreements, including with presidential candidates, Compl., at ¶ 74, also makes Plaintiffs' allegations implausible on their face. *See Vereen*, 623 A.2d at 1193 (holding that, while an implied contract does not require all contract elements to be committed to writing or stated orally in express terms, it must be inferable "from the conduct of the parties' in the milieu in which they dealt") (citation omitted); *Strauss*, 5 A.3d at 1036 (holding that, while the absence of a written contract is not dispositive, "it [c]asts doubt on whether the parties agreed to all of the material terms and agreed to be bound by any agreement," and raises serious questions as to why sophisticated parties engaged in a complex transaction did not clarify in writing "the subject matter, scope, duration, and terms of the agreement").

*Haney v. Marriott Int'l, Inc.*, No. 05-2501 (JDB), 2007 WL 2936087, at *9 (D.D.C. Oct. 9, 2007) (concluding patron injured at hotel did not tender anything in exchange for hotel's "alleged promise to pay [the patron's] medical costs," rendering promise an "unenforceable gratuitous promise").

      **c.**      **Plaintiffs Fail to Plausibly Allege Facts that Satisfy the Other Necessary Elements of an Implied Contract under District of Columbia Law.**

Even assuming that Plaintiffs could establish that the parties agreed to all material terms of the purported contract and intended to be bound (which they clearly cannot), they fail to allege facts sufficient to establish the other essential elements of an implied contract claim under District of Columbia law. Plaintiffs fail to plead facts that plausibly show that: (1) valuable services were rendered, (2) for the DNC, (3) which services were accepted by the DNC, used and enjoyed by it, and (4) under circumstances that reasonably notified the DNC that Plaintiffs expected to be paid (or given something in return) by the DNC. *See Perles*, 362 F. Supp. 2d at 198 (citing *Vereen*, 623 A.2d at 1193). The absence of just one of these elements is fatal to an implied breach of contract claim. *See Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 62 (D.C. 2005).

First, the Complaint does not plausibly allege that Plaintiffs rendered any valuable services to the DNC or that the DNC accepted or used such services. To the extent that Plaintiffs believe that "accept[ing] and specifically rel[ying]" on the DNC's unspecified "conditions, rules and regulations," Compl. at ¶ 38, constituted a valuable service to the DNC, the Complaint sets forth no facts indicating what those conditions or rules were, whether Plaintiffs abided by them, and, if so, whether and how abiding by such conditions or rules was valuable to the DNC. To the contrary, the Complaint alleges the *opposite*—that the DNC believed that De La Fuente's candidacy "threatened to siphon critical votes away from Defendants' favored Caucasian candidate, Hillary Clinton," Compl., at ¶¶ 2-3, and it thus "marginalize[d] Plaintiff De La Fuente to benefit the campaign of Hillary Clinton" *id.* at ¶ 53. Assuming that the DNC in fact held such views (which the DNC strongly and unequivocally denies), it cannot follow that it

simultaneously used and enjoyed services provided by De La Fuente's campaign. *See Berry Law PLLC v. Kraft Foods Grp., Inc.*, No. CV 13-0475 (RBW), 2013 WL 12061613, at *4 (D.D.C. Dec. 11, 2013) (no implied contract where plaintiff had not shown "some tangible benefit received" by defendant).

Plaintiffs' implied contract claim is also facially inadequate, because Plaintiffs fail to allege that they notified the DNC that Plaintiffs expected to receive consideration for the services that they purportedly provided to the DNC. Plaintiffs allege no facts suggesting that Plaintiffs expected consideration for abiding by the DNC's "conditions, rules and regulations"—let alone that Plaintiffs reasonably notified the DNC of their expectation. *See e.g.*, *Bloomgarden v. Coyer*, 479 F.2d 201, 209 (D.C. Cir. 1973) (finding no implied contract where, even if plaintiff "looked forward to personal payment for his services," the circumstances under which he performed such services did not "reasonably … put [defendants] on notice that he had that in mind").

Finally, nothing about Plaintiffs' inquiry as described would give the DNC reasonable notice that Plaintiffs were in fact "accept[ing]" a "condition precedent for entering the Democratic Party Presidential nominating process" in exchange for the DNC's provision of valuable resources to Plaintiffs. Compl., at ¶ 54. The description of their correspondence makes absolutely no mention of the unspecified "terms and conditions" that were allegedly being provided to the DNC as a valuable service. Compl., at ¶ 54. In sum, because Plaintiffs fail to plausibly allege that they rendered valuable services to the DNC, or that the DNC accepted those services with reasonable notice that Plaintiffs expected to be compensated for them, Plaintiffs have failed to plead the existence of an implied contract.

### d.    Courts Regularly Hold Similar Claims Not Actionable, Consistent with First Amendment Jurisprudence.

Courts that have had the opportunity to consider the viability of breach of contract claims between candidates and political parties have had no difficulty holding that a political party's relationship or standard communications with a primary candidate does not create a contract under the law. *See, e.g.*, *Swanson v. Pitt*, 330 F. Supp. 2d 1269, 1284 (M.D. Ala. 2004); *Steele v.*

*Johnson*, 458 P.2d 889, 891 (Wash. 1969) (affirming dismissal of primary candidate's breach of contract claim, finding no valid contract between the candidate and party). For example, in *Swanson v. Pitt*, the court rejected the plaintiff's argument that a primary candidate's "telephone conversations with the [political] party," "his payment of a qualifying fee," and the party's actions in "answer[ing] his questions and sen[ding] him qualifying papers to fill out" created a contract as a matter of law. *Pitt*, 330 F. Supp. 2d at 1284. This Court should reach the same conclusion.

Courts have also rejected allegations similar to those that Plaintiffs now make regarding the DNC's Charter, finding that "[a] constitution and by-laws [of a political party] are mere rules for the regulation of the conduct of members in their association and conducive to the orderly administration of the business which unites them," and "[t]hey can be given no other binding force." *McKane v. Adams*, 123 N.Y. 609, 613-14 (1890); *see also Berg v. Obama*, 574 F. Supp. 2d 509, 529 (E.D. Pa. 2008) (finding "statements of principle and intent" in political party platform are "not enforceable promises under contract law"), *aff'd*, 56 F.3d 234 (3d Cir. 2009); *St. John's United Church of Christ v. FAA*, 550 F.3d 1168, 1170 (D.C. Cir. 2008) (holding "a political promise [has] no legal force whatsoever").

These outcomes are consistent with the U.S. Supreme Court's long-standing jurisprudence recognizing and "vigorously affirm[ing] the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party '*select[s] a standard bearer* who best represents the party's ideologies and preferences.'" *Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000) (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989)) (emphasis added). "Freedom of association means not only that an individual voter has the right to associate with the political party of her choice, but also that a political party has a right to 'identify the people who constitute the association.'" *Eu*, 489 U.S. at 224 (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986)); *see also Jones*, 530 U.S. at 574 ("[A] corollary of the right to associate is the right not to associate."); *Democratic Party of U. S. v. Wis. ex rel. La Follette*, 450 U.S. 107, 122

(1981) ("[t]he freedom to associate for the 'common advancement of political beliefs' [ . . . ] necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only.") (citation omitted).

Allowing Plaintiffs' claims to go forward would raise serious First Amendment concerns. Specifically, Plaintiffs ask the Court to find it plausible that *any* self-declared candidate is entitled to "formalities, resources, logistical guidance, [] information," "general political assistance," contractual duties stemming from the Charter—and more, from a political party, solely based upon a candidate's unilateral action of filing paperwork with the FEC, stating his intention to seek that party's nomination for President, and requesting the party's internal documents. The Court should reject this invitation. Under Plaintiffs' theory, a political party organization that failed to provide such benefits would be found to have breached an implied contract or quasi-contractual relationship between the candidate and the political party organization, and the political party therefore would owe the candidate damages in the amount of *all amounts expended by the candidate* on the candidate's campaign. Such a cause of action could be used to severely burden parties' associational rights. Candidates openly hostile to a party's values, or candidates with no support among a party's members, could wield the threat of a lawsuit to enforce an implied contract to coerce that party into providing them resources and lending them legitimacy. The availability of such a cause of action would directly undermine the ability of a political party to select and support its standard bearers in violation of the party's First Amendment rights. *See Jones*, 530 U.S. at 575. For these additional reasons, Plaintiffs' claims should be dismissed with prejudice.

## 2. Plaintiffs Fail to Plausibly Allege that the DNC Breached Any Contract.

Even if the Complaint plausibly alleged that an implied contract existed between Plaintiffs and the DNC, the Court should still dismiss Plaintiffs' breach of contract claim, because there are no plausible allegations that the DNC breached an express or implied covenant of the purported implied contract. Plaintiffs allege that the DNC breached two distinct implied covenants purportedly contained in the parties' implied contract: (1) an "implied covenant of

neutrality"; and (2) an implied covenant of good faith and fair dealing. Compl., at ¶¶ 57, 72, 88-95. However, Plaintiffs fail to state a claim for breach under any of these theories.

*First*, as a matter of law, Plaintiffs' claim for breach of an "implied covenant of neutrality" should be dismissed, because it is not recognized by the District of Columbia courts. *See Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 627 n.2 (D.C. 1997) (construing plaintiff's claims regarding an implied covenant never recognized in the District of Columbia as claims regarding the implied covenant of good faith and fair dealing). Plaintiffs' references to such an implied covenant are, at best, a mislabeling of the implied covenant of good faith and fair dealing. For the reasons that follow, however, Plaintiffs cannot sustain that claim, either.

*Second*, Plaintiffs' breach of contract claim based on violation of a "covenant of neutrality," set forth in the parties' implied contract fails, because, as set forth above, there was no such implied contractual obligation and no plausible and non-conclusory allegations of a breach. *See Willmott v. Nat'l R. Passenger Corp.*, No. 81-0811 JGP, 1991 U.S. Dist. LEXIS 1208, *19 (D.D.C. Jan. 31, 1991) ("Where no contract existed, there can be no breach of contract."). Further, Plaintiffs fail entirely to plausibly allege how any such agreement injured them, which is required for standing purposes, as discussed *supra*.

*Third*, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing should also be dismissed, because there are no allegations plausibly suggesting that the DNC ever agreed to provide "logistical assistance," "guidance," "resources" or to "endorse" De La Fuente, allow him to participate in events, facilitate ballot access beyond providing information, or provide De La Fuente access to the Voter File. *See* discussion *supra*. Moreover, reasonable persons in the parties' shoes would not have expected the DNC to provide such benefits, especially where De La Fuente concedes that at least some of what he sought—e.g., "invitation to certain specific debates and town hall meetings"—"were contingent on objective factors," specifically, "required polling thresholds," that he does not allege he met. Compl. at ¶ 53; *see also Brown v. Sessoms*, 774 F.3d 1016, 1025 (D.C. Cir. 2014) (holding defendant did not breach covenant of good faith and fair dealing by failing to do something that he had no obligation to

do); *see also id.* (explaining a party breaches the implied covenant of good faith and fair dealing if it "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party to the contract[;]" no breach may be found when 'reasonable persons in parties' shoes would have expected contract to be performed as it was') (internal quotation marks and citations omitted).

### B.      Count II (Promissory Estoppel) Should Be Dismissed.

Plaintiffs' promissory estoppel claim should be dismissed, as the Complaint alleges no facts that plausibly suggest that the DNC made any promise that could support such a claim. To establish a claim for promissory estoppel, a plaintiff must show: "(1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to his detriment." *Myers v. Alutiiq Int'l Sol., LLC*, 811 F. Supp. 2d 261, 272 (D.D.C. 2011) (citing *Simard v. Resolution Trust Corp.*, 639 A.2d 540, 552 (D.C. 1994)). While a promise need not be as specific and definite as a contract for purposes of promissory estoppel, it must contain definite and specific terms. *Id.* (citing *In re U.S. Office Prods.*, 251 F. Supp. 2d at 72).

Here, Plaintiffs fail to allege a promise sufficient to support a claim for promissory estoppel. *First*, the allegations that the DNC made "promises" to provide: (1) "assistance to in the form of introductions to State Party/committee officials"; (2) logistical resources"; and (3) "general political assistance," Compl., at ¶ 102, do not plausibly allege a promissory estoppel claim, because they are not definite or specific. *See Myers*, 811 F. Supp. 2d at 272 (requiring "a promise with definite terms" for a claim of promissory estoppel); *In re U.S. Office Prods.*, 251 F. Supp. 2d at 72 (holding promissory estoppel unavailable for "vague and indefinite" "promise"). De La Fuente's asserted reliance on statements by Congresswoman Wasserman Schultz are not even "promises" but public statements the Congresswoman made in an interview. Compl. at ¶¶ 36-37. The Complaint cites her statements that "[t]he Democratic National Committee remains neutral," and "I remain, as I have been from the beginning, neutral." *Id.* at ¶ 37. Putting aside the fact that, as discussed, Plaintiffs fail to plausibly allege that the Defendants did not in fact act neutrally in the primary process, these allegations are, on their face, too unclear and

indefinite to support a claim for promissory estoppel. *See Mero v. City Segway Tours of Washington DC, LLC*, 826 F. Supp. 2d 100, 106 (D.D.C. 2011). Similarly, to the extent that Plaintiffs purport to have relied upon these vague and indefinite "promises," such reliance would have been unreasonable as a matter of law. *See Myers*, 811 F. Supp. 2d at 272 (dismissing promissory estoppel claim "[b]ecause it is unreasonable to rely on an indefinite promise") (citing *Parnigoni v. St. Columba's Nursery Sch.*, 681 F. Supp. 2d 1, at 26 (D.D.C. 2010)).

*Second*, the allegation that the DNC made a promise to Plaintiffs with its assertion that it could make "introductions to State Party officials" also does not set forth a claim for promissory estoppel, because the DNC would not reasonably have expected to induce action or forbearance on behalf of Plaintiffs with this statement. Compl., at ¶ 15; *see Granfield v. Catholic Univ. of Am.*, 530 F.2d 1035, 1039 (D.C. Cir. 1976) (requiring "promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee") (citation omitted).

*Third*, to the extent that Plaintiffs allege that there were more specific promises made by the DNC, the Complaint fails to plausibly allege that the DNC actually made such promises to *Plaintiffs* (as discussed *supra* in relation to Plaintiffs' breach of contract claim). Indeed, the Complaint only alleges a few specific instances in which the DNC purportedly denied *De La Fuente* a benefit, resource, or service. Specifically, the Complaint alleges that the DNC (1) did not "endorse" De La Fuente's candidacy, thereby purportedly preventing him from gaining ballot access in various states, *id.* at ¶¶ 45-47; (2) did not provide De La Fuente an opportunity to license access to the DNC Voter File, *id.* at ¶ 61; and (3) withheld information about the location of Nevada caucus sites. *Id.* at ¶ 46.[9] But Plaintiffs allege no facts plausibly suggesting that Defendants ever promised to provide these specific benefits *to Plaintiffs* in the first place. The only alleged source of any "promises" was "Ms. Dacey." *Id.* at ¶ 15. However, the only

---

[9] Each of these specific allegations is against the DNC only; the only specific allegation directed toward Congresswoman Wasserman Schultz is about a public statement made during television and newspaper interviews that were not directed, nor could they be reasonably interpreted as directed, to Plaintiffs. *Id.* at ¶¶ 36-37.

communication alleged in the Complaint between Ms. Dacey and Plaintiffs concerns "introductions to State Party officials," "logistical resources," and "general political assistance"—not to "endorse" De La Fuente, not to provide him with an opportunity to license the DNC's proprietary Voter File, and not to provide him with information about where the Nevada caucus sites were located (information that, in any event, was public, *see e.g.*, Frost Decl., Ex. D, Press Release, Nevada Democrats, NV Dems Announce Locations, Guidelines for At-Large Precinct Caucuses on Las Vegas Strip (Jan. 29, 2016)). Accordingly, Plaintiffs' promissory estoppel claim cannot be sustained.

## C.   Count III (Section 1981) Should Be Dismissed.

Plaintiffs' Section 1981 claim should be dismissed because the Complaint does not plausibly allege that Defendants intentionally discriminated against Plaintiffs in the making of a contract. Section 1981 prohibits intentional racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b). To state a claim under Section 1981, a plaintiff "'must allege that (1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate against the plaintiff on the basis of race; and (3) the discrimination concerned an activity enumerated in § 1981.'" *Morris v. Carter Glob. Lee, Inc.*, 997 F. Supp. 2d 27, 37 (D.D.C. 2013) (quoting *Mazloum v. D.C. Metro. Police Dep't*, 522 F. Supp. 2d 24, 37 (D.D.C. 2007)). Plaintiffs' Section 1981 claim cannot be sustained as a matter of law because: (1) Plaintiffs fail to plausibly allege an implied contract, on which the DNC failed to perform; and (2) Plaintiffs do not plausibly allege that the DNC failed to enter into a contract with Plaintiffs, or failed to perform an implied contract with Plaintiffs, because of De La Fuente's race.

### 1.   Plaintiffs Fail to Plausibly Allege the Existence of an Implied Contract.

Plaintiffs' Section 1981 claim first fails because there are no plausible allegations of an implied agreement between the DNC and Plaintiffs, or between the DNC and any other candidate, based on the theories set forth in the Complaint. Section 1981 claims of the type

Plaintiffs allege require the existence of a contractual agreement or proposed contract involving the defendant. *See Burnett v. Sharma*, 511 F. Supp. 2d 136, 141 (D.D.C. 2007); *see also Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (stating Section 1981 provides plaintiffs with relief "when racial discrimination *blocks the creation of a contractual relationship*, as well as when racial discrimination *impairs an existing contractual relationship*, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship") (emphasis added); *see also* Compl., at ¶¶ 114-15.

Here, Plaintiffs' Section 1981 claim fails because the Complaint does not plausibly allege that an implied contractual relationship existed between the Plaintiffs and the DNC, or between the DNC and any other candidate for President, based on the theories it sets forth. As described above, Plaintiffs' theories are that: (1) non-specific and routine communications between any and all primary candidates and a political party establish an implied contract between each candidate and the party; and (2) the DNC's Charter, on its own, creates an implied agreement between a primary candidate and a political party. *Id.* But as discussed *supra*, Plaintiffs fail to plausibly allege that an implied contract ever existed between the parties on these bases. *See also Miller v. Bridgeport Bd. of Educ.*, No. 3:12-CV-01287 VLB, 2014 WL 1117790, at *2–*3 (D. Conn. Mar. 19, 2014) (analyzing whether plaintiff plausibly alleged an implied contract under state common law to determine whether plaintiff plausibly alleged rights under an existing contract for purposes of Section 1981). Plaintiffs' Section 1981 claim accordingly fails.

### 2.    Even if Plaintiffs Adequately Alleged the Existence of an Implied Contract, Plaintiffs Fail to Plausibly Allege Racial Discrimination.

Even assuming *arguendo* that Plaintiffs alleged an implied contract between Plaintiffs and the DNC, their Section 1981 claim would still fail because Plaintiffs have not plausibly alleged that De La Fuente's race was the reason why any alleged contractual benefit was denied to him. A plaintiff must allege some facts that demonstrate that his *race was the reason* for the defendant's action to allege a Section 1981 claim. *Morris*, 997 F. Supp. 2d at 37 (quoting *Bray v. RHT, Inc.*, 748 F. Supp. 3, 5 (D.D.C. 1990)) *aff'd sub nom. Bray v. Hebble*, 976 F.2d 45 (D.C.

Cir. 1992); *Mesumbe v. Howard Univ.*, 706 F. Supp. 2d 86, 92 (D.D.C. 2010) (holding complaint's failure to indicate who allegedly received preferential treatment supports dismissal for failure to allege a discriminatory motive). Merely invoking one's race is not enough. *Bray*, 748 F. Supp. at 5 ("In order to pursue a cause of action under § 1981, plaintiff cannot merely invoke his race in the course of a claim's narrative and automatically be entitled to pursue relief.").

Here, none of the facts alleged in the Complaint plausibly suggest that the DNC denied any contractual benefits to Plaintiffs because of race. Specifically, Plaintiffs allege that De La Fuente was denied: (1) access to the South Carolina presidential primary ballot, *see* Compl., at ¶ 111; (2) information about where Nevada's caucuses were being held, *id.* at ¶ 112; (3) equal access to information, debates, party events and meetings, and logistical campaign information, *id.* at ¶ 113; and (4) access to the DNC's Voter File, *id.*

None of these allegations support a racially discriminatory motive on behalf of the DNC. As an initial matter, De La Fuente's attempt to assert a racial discrimination claim based on his assertion that he was wrongfully denied access to the South Carolina presidential primary ballot should be denied on the grounds of issue preclusion. A federal district court in South Carolina previously granted the state Democratic party summary judgment on De La Fuente's claims that he was wrongfully denied access to that ballot, including specifically on a claim that he was denied access on the basis of his race. *See generally De La Fuente*, 2017 WL 3085750. To the contrary, the court found both that the decision not to put De La Fuente's name on the ballot was rational, because, *inter alia*, "[i]t is undisputed that [he] had no actual, non-electronic presence in South Carolina," and even then, his only contact with the state was "through a Facebook page— one not even directed specifically at South Carolina, but a general campaign page," *id.* at *3; he "testified at deposition [that] he had only been to South Carolina four times in conjunction with his 2016 presidential campaign--two of which were his court and deposition appearances for this case"; *id.*; he "conceded he had no endorsements by elected officials or clergy in South Carolina and did not distribute any printed campaign materials in South Carolina," *id.*; and De La Fuente

was unable to point to a single news article that "indicate[d] [he] was actually a viable candidate for President," *id.* at *4. The court also expressly rejected De La Fuente's argument that he was denied access to the ballot because of the purported "'political and electoral threat that plaintiff's Hispanic heritage posed to Hillary Clinton,'" *id.* (quoting plaintiff's brief), finding that De La Fuente "offer[ed] no factual support for this claim other than an assertion in his deposition [that] SCDP discriminated against him because he is Hispanic, and offers as evidence the prior outcomes of elections." *Id.* Finding this clearly insufficient to succeed on this claim, the court granted summary judgment to the SCDP on this basis as well. *Id.* Thus, the issue of whether discrimination played a part in the exclusion of De La Fuente from the South Carolina ballot has already been decided against Plaintiffs; he may not now attempt to relitigate that judgment in this court. *See, e.g.*, *Sheppard v. District of Columbia*, 791 F. Supp. 2d 1, 5 (D.D.C. 2011).

As for De La Fuente's claims specifically related to the Nevada Democratic Party, as previously discussed, information about where Nevada caucus sites were located was public information. *See, e.g.*, Frost Decl., Ex. D. Thus, it is far from clear exactly what it is that De La Fuente believes he was denied as it relates to the locations of these caucuses, but in any event, these allegations plainly do not support a claim of racial discrimination.

As for his conclusory claims that he was denied equal access to events, the Complaint acknowledges that invitations events were "contingent on objective factors," and further admits that De La Fuente did "not meet the required polling thresholds necessary to require Defendant DNC to invite Plaintiff De La Fuente to the important debates and town hall meetings." *Id.* at ¶ 53. Plaintiffs also do not set forth specific, non-conclusory facts that *similarly situated* white candidates—for example, those who received the same number of votes or roughly the same level of support in polls—acquired the benefits to which De La Fuente claims he was entitled. The Complaint's wholly conclusory assertions that the DNC provided benefits to "similarly situated White presidential candidates," Compl., at ¶ 48, *see also id.* at ¶ 116, do not satisfy the motion to dismiss standards. *Id.* at ¶ 116; *see Pender v. Bank of Am. Corp.*, No. 3:05-CV-00238-GCM, 2016 WL 7320894, at *5 (W.D.N.C. Dec. 15, 2016) (concluding that "whether the

declarant is a 'qualified person' is a legal conclusion, not a fact"); *St. Croix v. Genentech, Inc.*, No. 8:12-cv-891-T-33EAJ, 2012 WL 2376668, at *3 (M.D. Fla. June 22, 2012) (holding the allegation that "numerous individuals who were similarly situated" was "a legal conclusion that does not satisfy *Twombly* and *Iqbal* pleading standards"); *see also Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555) (holding bare bones assertions of legal conclusions will not suffice).

For each of these reasons, Plaintiffs' Section 1981 claim must be dismissed.

**D.     Count IV (Section 1985) Should Be Dismissed.**

Plaintiffs' Section 1985 claim should be dismissed, because the Complaint fails to plausibly allege a conspiracy on behalf of the DNC. Plaintiffs purport to assert a civil conspiracy claim against the DNC under 42 U.S.C. § 1985, which creates liability for several, distinct types of conspiracies:

> Section 2 . . . prohibits conspiracies to interfere with the performance of duties by federal officers (§ 1985(1)), with the administration of federal courts (§ 1985(2), first part), with the administration of state courts (§ 1985(2), second part), with the duties of a state officer (§ 1985(3), second clause), and with the right to support candidates in a federal election (§ 1985(3), third clause).

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 839 n.1 (1983) (Blackmun, J. dissenting); *see also Bretz v. Kelman*, 773 F.2d 1026, 1027 n. 3 (9th Cir. 1985).

As an initial matter, the Complaint does not specify which type of Section 1985 civil conspiracy Plaintiffs intend to assert. Instead, the Complaint paraphrases different parts of the statute and does not clearly distinguish between, or state a claim based on, any one of the different types of civil conspiracy that the Act may support. That said, it appears most likely that Plaintiffs intend to bring a claim under Section 1985(3).[10]

---

[10] Even if Plaintiffs intended to bring a claim under Section 1985(1), their claim would fail because there are no allegations that De La Fuente was ever elected President (or to any other federal office). Section 1985(1) is intended to protect current and incoming "*federal officers* against interference from persons outside the federal government." *Pope v. Bond*, 641 F. Supp. 489, 497 (D.D.C. 1986) (emphasis added); *see also United Bhd. of Carpenters*, 463 U.S. at 839 n.1 (Blackmun, J., dissenting) (stating Section 1985(1) "prohibits conspiracies to interfere with the performance of duties by federal officers"); *Bretz*, 773 F.2d at 1027 n.3 (stating Section 1985(1) "concerns preventing an officer of the United States from performing his or her duties").

Section 1985(3) states:

> If two or more persons in any State or Territory *conspire*, or go in disguise on the highway or on the premises of another, [(1)] for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or [(2)] for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or [(3)] if two or more persons *conspire* to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy.

Based on the text, each clause of Section 1985(3) requires a conspiracy, which involves an agreement to take part in an unlawful action. *Morris*, 997 F. Supp. 2d at 39. In particular: (1) the first clause of Section 1985(3) creates liability for conspiracies initiated by private parties to deny protected persons or classes equal protection under the law, by preventing them from equally exercising their civil rights; (2) the second clause of Section 1985(3) creates liability for conspiracies that have the purpose of preventing or hindering State authorities from giving or securing equal protection of the law to all persons within such State; and (3) the third clause creates liability for conspiracies pertaining to the right to support candidates in a federal election.

Plaintiffs' Section 1985(3) claim should be dismissed because there are no plausible allegations in the Complaint that the DNC was involved in any conspiracy, much less one that could satisfy the required elements of the statute. In the Complaint, Plaintiffs appear to infer that the DNC somehow conspired with state Democratic Party officials to "hamper, impede and sabotage" De La Fuente's campaign. Compl., at ¶ 121. In support of this claim, Plaintiffs cite to actions taken by *non-DNC* entities that allegedly hampered his presidential bid: (1) the Nevada Democratic Party's "refus[al] to provide Plaintiffs with the location of the caucus sites, preventing Plaintiff from being able to complete [sic] in the caucus," characterized as the result of the DNC's failure to "endorse" or "sanction" De La Fuente's candidacy, *id*. at ¶¶ 43-44; (2) the South Carolina Democratic Party's denial of De La Fuente's access to "the key early South

Carolina Democratic Presidential Primary election ballot," allegedly attributable to the DNC's alleged "failure to provide promised introductions," *id*. at ¶ 52; and (3) De La Fuente's inability to meet certain "objective factors, such as previous polling results" that would have garnered an invitation to "specific debates and town hall meetings," which he attributes to the DNC's purported effort to "marginalize" Plaintiffs, *id*. at ¶ 53. These vaguely alleged "conspiracies" belies the Complaint's failure to attribute any action that "hampered" or "injured" his campaign to the DNC itself. Further, and as discussed *supra*, the Nevada caucus information was publicly available, a federal district court judge has previously rejected De La Fuente's arguments that his exclusion from the presidential primary ballot in South Carolina was somehow improper, and De La Fuente himself acknowledges that he did not meet the objective thresholds for participating in specific types of party events.

Nor can any of the other various actions that the Complaint alleges the DNC (and others) took plausibly be construed as unlawful, which is required for a Section 1985(3) claim. For example, Plaintiffs allege that the DNC:

- "[O]n information and belief [ . . . ] communicat[ed] directly that Plaintiff De La Fuente was not an 'endorsed' or 'sanctioned' candidate'" with State Democratic Party Committee members and officials," Compl., at ¶ 47;

- "[F]ailed to introduce Plaintiff De La Fuente to political leadership of the [s]tate [sic] Democratic Party committees," *id.* at ¶ 50;

- Did not arrange for De La Fuente to obtain access to debates and town halls, where invitation was contingent on meeting "objective factors," *id.* at ¶ 53;

- Did not provide De La Fuente an opportunity to license DNC Voter File Data, *id.* at ¶¶ 60-62; and

- Entered into a joint fundraising agreement with one of the primary candidates, *id.* at ¶ 74.

No law: (1) discusses any process for or requires the DNC to "sanction" or "recognize" a candidate; (2) requires a political party to provide publicity for a candidate; (3) requires a political party to put certain candidates on stage or permit them to attend events; (4) requires a

political party to give any candidate information or data; or (5) bars political parties from entering into certain contracts. Nor does any law prevent the DNC from communicating to other persons or entities that the DNC does not "recognize" or "sanction" a particular candidate. To the contrary, a political party's decision not to associate itself with or engage in advocacy activities on behalf of a particular candidate is a core component of its associational rights. *See, e.g.*, *Jones*, 530 U.S. at 574; *La Follette*, 450 U.S. at 122. Plaintiffs' claim, in effect, would transform a party organization's decision to decline resources or services to a particular candidate (or to communicate its non-endorsement of a particular candidate) into *prima facie* evidence of a conspiracy to unlawfully interfere with the right of citizens to support that candidate in a particular election.

Even assuming *arguendo* that Plaintiffs could allege a conspiracy, their Section 1985(3) claim—to the extent it is brought under the first clause of Section 1985(3)—would still fail, because there are no plausible allegations in the Complaint that the DNC had the requisite invidious discriminatory animus. In stating a claim under the first clause of Section 1985(3), Plaintiffs must allege that the DNC acted with invidiously discriminatory animus against a protected class. *See Lattisaw v. D.C.*, 118 F. Supp. 3d 142 at 162 (D.D.C. 2015) (quoting *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009)), *aff'd*, 672 F. App'x 22 (D.C. Cir. 2016). However, as discussed above, with respect to Plaintiffs' Section 1981 claims, the Complaint is devoid of any such plausible allegations. In fact, Plaintiffs do not even allege invidious racial animus in the civil conspiracy count of their Complaint. *See* Compl., at ¶¶ 118-124. Thus, any claim that the DNC violated clause one of Section 1985(3) should be dismissed.

Further, Plaintiffs' Section 1985(3) claim—to the extent it is brought under the second clause—would still fail, because the Complaint fails to allege any facts plausibly suggesting that the DNC was involved in any activity to prevent or hinder State authorities from giving or securing equal protection of the law to all persons within such State. Though the second clause of Section 1985(3), also known as the "hindrance" or "prevention" clause, is rarely litigated, and the elements of a valid claim remain somewhat unclear, the plain text of the statute requires a

conspiracy with the purpose of "hindering *the constituted authorities of any State or Territory*." 42 U.S.C. § 1985(3); *compare, e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 279-83 (1993) (majority op.) (declining to reach claim under hindrance clause and criticizing elements of hindrance clause claim set forth in dissents), *with id.* at 291-307 (Souter, J., concurring in part and dissenting in part) (discussing elements of claim), *and id.* at 313-20, 339-44 (Stevens, J., dissenting) (same), *and id.* at 355-356 (O'Connor, J., dissenting) (same); *see also id.* at 283 n.15 (majority opinion) (assuming hindrance clause applies to conspiracies to hinder one or more state officers); *id.* at 301 (Souter. J., dissenting) ("[The] prevention clause's distinctive requirement [is] that the purpose of a conspiracy actionable under its terms must include a purpose to accomplish its object by preventing or hindering officials in the discharge of their constitutional responsibilities."). Here, Plaintiffs fail to plausibly allege that the DNC was involved in any activity to prevent or hinder State authorities from giving or securing equal protection of the law to all persons. No state authorities are mentioned in the Complaint and there are no allegations that the DNC "[interfered] with [these] state officials" in depriving Plaintiffs of equal protection of the law. *Bray*, 506 U.S. at 339.

Finally, Plaintiffs' Section 1985(3) claim—to the extent it is brought under the third clause—also cannot be maintained, because the Complaint fails to allege any facts plausibly suggesting that the DNC used force, intimidation, or threat to prevent citizens from supporting De La Fuente's candidacy. *See Bretz*, 773 F.2d at 1027 n. 3; *United Bhd. of Carpenters*, 463 U.S. at 839 n. 1 (characterizing the claim as a conspiracy to interfere "with the right to support candidates in a federal election"); 42 U.S.C. 1985(3) (requiring "prevent[ion] by force, intimidation, or threat, [of] any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person"). Thus, the Court should dismiss Plaintiffs' Section 1985 claim.

**E.     Counts V & VI (Fraud and Negligent Misrepresentation) Should Be Dismissed.**

Plaintiffs' fraud and negligent misrepresentation claims, virtually identical in substance and form, should be dismissed because the Complaint's allegations fail to even approach the

heightened pleading standards required for claims sounding in fraud. Both of these claims are subject to Rule 9's stricter pleading requirements, which mandate that such claims be pled "with particularity." *Lewis v. Full Sail, LLC*, 266 F. Supp. 3d 320, 325 (D.D.2. 2017) (quoting Fed. R. Civ. P. 9(b)). This requires that Plaintiffs "state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud." *U.S. ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981) (citing 2A J. Moore, Federal Practice P 9.03, at 9-20 to 9-24 (2d ed. 1980)). It also "require[s] pleaders to identify individuals allegedly involved in the fraud." *U.S. ex rel. Williams v. Martin-Baker Aircraft Co*., 389 F.3d 1251, 1256 (D.C. Cir. 2004) (citation omitted). Neither claim as pled meets this strict threshold.

*First*, the Complaint fails to plausibly allege any of the required elements for either cause of action, relying on the bare notice pleading that is regularly found insufficient to maintain these types of claims beyond a motion to dismiss. To plead fraud, Plaintiffs must show (with particularity) "(1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977) (citation omitted). Rather than plead these elements with specificity, the substance of the Complaint is a rote recitation of the elements of a fraud claim: that the DNC (through third-parties) made vague false statements or omissions of facts, intended to induce reliance, and Plaintiffs' relied on them, causing injury. Compl., at ¶¶ 126-32. Plaintiffs' negligent misrepresentation count fails for the same reasons. "[A] plaintiff alleging negligent misrepresentations or omissions must show '(1) that [the defendant] made a false statement or omitted a fact that he had a duty to disclose; (2) that it involved a material issue; and (3) that [the plaintiff] reasonably relied upon the false statement or omission to his detriment.'" *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015) (citation omitted). Yet, Plaintiffs again simply regurgitate these elements in conclusory fashion: stating that the DNC made misrepresentations that it knew to be false, intending reliance, and that Plaintiffs relied on them to their injury—without articulating the reasonableness of

Plaintiffs' purported reliance on the allegedly false statements. Bare and conclusory recitations with no facts that make out a plausible claim for relief fail even Rule 8 standards; by definition they do not meet Rule 9(b)'s stricter requirements. *See Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 139 (D.D.C. 2013).

*Second*, as stated above, Plaintiffs' Complaint only identifies one category of alleged "false" statements by Defendants—"public declarations of neutrality and impartiality with respect to the 2016 Democratic presidential nomination process," Compl., at ¶ 40, and contained in the DNC's Charter and Bylaws. *Id*. at ¶ 10; *see also id*. at ¶ 38. However, as discussed, the bases asserted in the Complaint for contending that these statements are false fall far short of evidence that, even if believed, could sustain a finding that the DNC did not act neutrally in the primary. *See* discussion *supra*. On this rationale alone, both counts are subject to dismissal.

*Third*, Plaintiffs have not shown (and cannot show) that any reliance on statements of general neutrality would have been justified as a matter of law. Reliance, just as every element in a common law fraud claim, must be pleaded with particularity. *See Busby*, 932 F. Supp. 2d at 139 (dismissing plaintiff's fraud claim where it was "conceivable" the plaintiff relied on representations of the defendant, but she had not met "the more demanding pleading standard of Rule 9(b)"). Plaintiffs' fraud and negligent misrepresentation claims rest on the assertion that De La Fuente relied upon statements of neutrality contained in the DNC Bylaws and Charter—or stated by third parties—and as a result De La Fuente claims to have entered the 2016 presidential contest to his alleged detriment. However, taken as true, such reliance would be patently unreasonable. Reliance is unreasonable "if there was an adequate opportunity to conduct an independent investigation and the party making the representation did not have exclusive access to such information." *Baker v. Gurfein*, 744 F. Supp. 2d 311, 319 (D.D.C. 2010) (citation omitted).

Though the DNC strongly denies that it was not neutral in the primary process, even taking the Complaint's allegations as true as is appropriate at the motion to dismiss stage, Plaintiffs had sufficient opportunity prior to De La Fuente's entry into the presidential race in

October 2015 to investigate the process of participation in state presidential primaries and the type and extent of support the DNC could provide. Equating statements of DNC neutrality with a guarantee of unspecified and unlimited DNC logistical support and general campaign assistance is unreasonable on its face. So, too, is equating statements of DNC neutrality with a guarantee of Plaintiffs' ultimate success in a presidential campaign. Thus, because Plaintiffs have not and cannot show that their alleged reliance was reasonable, their fraud and misrepresentation claims are both subject to dismissal. *See Malek v. Flagstar Bank*, 70 F. Supp. 3d 23, 31 (D.D.C. 2014) (dismissing fraud claim where plaintiff failed to allege reasonable reliance); *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1304, 1306–07 (11th Cir. 2003) (affirming dismissal of fraud and negligent misrepresentation claims where plaintiffs' claimed reliance was unreasonable); *Garcia v. Santa Maria Resort*, Inc., 528 F. Supp. 2d 1283, 1295 (S.D. Fla. 2007) (dismissing negligent misrepresentation claims because plaintiffs' reliance on defendants' oral misrepresentations was not reasonable). Further, Plaintiffs' continued expenditures in the 2016 presidential campaign belie the suggestion that entry into the presidential race was reliant on the DNC's position, where De La Fuente pursued and received the Reform Party's nomination in August 2016. *See* Frost Decl., Ex. E, Richard Winger, *Reform Party Nominates Rocky De La Fuente for President*, Ballot Access News (Aug. 9, 2016); *see also Philip Morris USA, Inc.*, 2004 WL 5355971, at *1 (finding court may take judicial notice of historical and political facts).

## V.  CONCLUSION

For the reasons set forth above, Defendants respectfully request that their motion to dismiss Plaintiffs' Complaint be granted and this matter dismissed in its entirety, with prejudice.

Dated: June 11, 2018

Respectfully submitted,

**PERKINS COIE LLP**

By: ___/s/ *Elisabeth C. Frost*_____

    Marc E. Elias (D.C. Bar No. 442007)
    Elisabeth C. Frost (D.C. Bar No. 1007632)
    **Perkins Coie, LLP**
    700 13th St. N.W., Suite 600
    Washington, D.C. 20005-3960
    Phone: (202) 654-6200
    Fax: (202) 654-9106
    melias@perkinscoie.com
    efrost@perkinscoie.com

    *Attorneys for Defendant*s

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been sent via the Court's electronic notification system and first class U.S. mail to the following parties on June 11, 2018:

Roque De La Fuente
5440 Morehouse Drive
Suite 4000
San Diego, CA 92121

*Plaintiffs, Pro Se*

Rocky 2016 LLC
5440 Morehouse Drive
Suite 4000
San Diego, CA 92121

**VIA ECF AND MAIL**

/s/ *Elisabeth C. Frost*
Elisabeth C. Frost
Attorney for Defendants