# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROQUE "ROCKY" DE LA FUENTE and : 
ROCKY 2016 LLC, :
 :
     Plaintiffs, : Civil Action No.: 18-336 (RC)
 :
     v. : Re Document Nos.: 6, 14
 :
DNC SERVICES CORPORATION and :
DEBORAH WASSERMAN SCHULTZ, :
 :
     Defendants. :

## <u>MEMORANDUM OPINION</u>

### GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS' MOTION TO CONSOLIDATE

## I. INTRODUCTION

Plaintiff Roque De La Fuente, proceeding *pro se*, is a Mexican-American entrepreneur from California who unsuccessfully ran in the 2016 Democratic presidential primary. With the benefit of hindsight, he believes that the deck was stacked against his campaign from the start. He claims that Defendants, the Democratic National Committee ("DNC") and its then-chairperson,[1] Deborah Wasserman Schultz, thwarted his campaign because he was a threat to steal Hispanic-American votes from Hillary Clinton, votes necessary to seal her nomination for the 2016 election. He seeks over $6 million in compensatory damages and $1 million in punitive damages, under breach of contract, promissory estoppel, race discrimination, conspiracy to violate civil rights, and misrepresentation theories. Mr. De La Fuente's breach of contract, promissory estoppel, and misrepresentation theories all fail for similar reasons: He has not

---

[1] The DNC was incorporated as "DNC Services Corporation." *See* Defs.' Mot. Dismiss ("Defs.' Mot.") at 1, ECF No. 6. It does business as the DNC. *See id.*

adequately identified a definite promise or offer of contract terms, nor has he sufficiently explained why it was reasonable for him to take action based on the vague and indefinite communications he has identified. Mr. De La Fuente's discrimination theory fails because he has not plausibly alleged that Defendants thwarted his campaign efforts because of his race. And Mr. De La Fuente's conspiracy theory fails because he has not adequately identified an agreement between two or more people, or organizations, to deprive him of his civil rights. That said, the Court believes that Mr. De La Fuente is entitled to another bite at the apple. Thus, the Court will dismiss Mr. De La Fuente's complaint without prejudice.

## II. BACKGROUND

Mr. De La Fuente is a Mexican-American "entrepreneur, businessman, and real estate developer" from San Diego, California. Compl. ¶ 5, ECF No. 1. On October 1, 2015, he registered a political campaign committee, "Rocky 2016," with the Federal Election Commission ("FEC"), and began a campaign to seek the Democratic Party nomination for the 2016 Presidential election. *See id.* ¶ 9. He notified the DNC of his campaign in a December 2015 letter, in which he also sought "campaign support and general information on the Democratic Party's nominating process." *Id.* ¶ 13.

Mr. De La Fuente claims that Defendants made certain promises that caused him to pursue his unsuccessful campaign, which cost approximately $6.7 million when all was said and done. *See id.* ¶ 16. First, Mr. De La Fuente alleges that he would not have entered the DNC's "nomination process" absent Article Five, Section Four of the DNC's Charter and Bylaws. *See id.* ¶¶ 28, 34. That provision states, in relevant part, that the DNC's chairperson—at the time, Ms. Schultz—"shall exercise impartiality and evenhandedness as between Presidential

candidates and campaigns."[2] *Id.* ¶ 28.  According to Mr. De La Fuente, the provision requires the DNC to "be an objective facilitator among candidates," and it forbids the DNC from "endors[ing]" or "differentiat[ing] between 'sanctioned' and/or 'unsanctioned' candidates."  *Id.* ¶ 31.  Second, Mr. De La Fuente alleges that a DNC employee, "Ms. Dacey," sent "correspondence" to him in which the DNC promised to "provide assistance . . . through introductions to State Party officials, logistical resources, and general political assistance."  *Id.* ¶ 15.  Third, Mr. De La Fuente alleges that the DNC "expressly agreed to provide all registered Democratic Presidential candidates and campaigns access to the DNC's voter data base [sic] and other logistical assistance, guidance, resources to permit candidates to build their campaigns . . . ."  *Id.* ¶ 32.

Mr. De La Fuente claims that despite these promises, Defendants did not help his campaign in any way.  In fact, Mr. De La Fuente alleges, Defendants actively sabotaged him.  The DNC told its "state affiliate party organs" that Mr. De La Fuente was not an "endorsed" or "sanctioned" candidate, which caused the Nevada State Democratic Party to withhold from him the locations of its Democratic caucus sites.  *See id.* ¶¶ 43–46.[3]  The DNC also failed to make good on its promise to introduce Mr. De La Fuente to key state officials, which caused him to be denied access to South Carolina's primary ballot.  *See id.* ¶¶ 50–51.  The DNC's conduct

---

[2] Mr. De La Fuente also alleges that Ms. Schultz "publicly affirmed [the DNC's] impartiality and evenhandedness" in a series of articles and television appearances in 2015 and 2016.  *See id.* ¶¶ 36–37.

[3] In the body of his complaint, Mr. De La Fuente at times identifies the Nevada state party organization as a Defendant.  *See* Compl. ¶ 9.  He does not however, identify the Nevada organization as a Defendant in his complaint's introduction, *see id.* at 1–2, in his complaint's subsection describing the "Parties," *see id.* ¶ 5–8, or in his other filings, *see, e.g.*, Pls.' Opp'n at 14 (referring to "Defendants' DNC affiliate Nevada State Democratic Party").  And the record does not indicate that Mr. De La Fuente effected service on the Nevada organization.  The Court thus assumes that Mr. De La Fuente did not intend for the Nevada organization to be a party in this case, and it will treat Mr. De La Fuente's references to the contrary as typos.

"ensure[d] that [Mr.] De La Fuente would not meet the required polling thresholds necessary to" secure invitations to "important debates and town hall meetings." *Id.* ¶ 53. And the DNC refused to grant Mr. De La Fuente access to its Voter Data File, a "compilation of all registered Democrats in the United States," which included "vital voter information." *See id.* ¶¶ 59–62, 76–77, 81. Mr. De La Fuente alleges that "only selected Caucasian Democratic presidential candidates" were given that access. *Id.* ¶ 80.

Mr. De La Fuente has a theory for why Defendants would want his campaign to fail, a theory that permeates his filings. Mr. De La Fuente is Hispanic-American, part of "a vital and growing constituency within the Democratic Party." *Id.* ¶ 19. His "more moderate economic and social policy agenda aligns more closely to the experiences of Hispanic-America's religious and entrepreneurial instincts than the more radical policies advanced by any of the other candidates that sought the 2016 Democratic Party nomination." *Id.* According to Mr. De La Fuente, Defendants recognized his "growing traction with Hispanic-American voters" in late 2015 and early 2016, voters that Hillary Clinton needed to secure the Democratic nomination. *Id.* ¶ 20. This was a problem for the DNC, as it was "biased in favor of" Secretary Clinton; it "devoted its considerable resources to supporting [her] over any of the other Democratic candidates . . . ." *Id.* ¶ 41. Defendants "thus considered [Mr.] De La Fuente's race and ethnicity as a threat to Hillary Clinton's campaign that needed to be curtailed and marginalized to save her candidacy." *Id.* ¶ 23. At the same time, Defendants "desired the public trappings of a contested presidential nominating process," leading them to seek candidates like Mr. De La Fuente to enter the race in the first place. *Id.* ¶ 38.

In February 2018, Mr. De La Fuente and his campaign, proceeding *pro se*, brought this lawsuit, asserting that Defendants engaged in actionable misrepresentations, contract- and

promise-based violations, and constitutional violations.[4]  Shortly thereafter, Defendants moved

to dismiss the complaint.[5]  *See* Defs.' Mot. Dismiss ("Defs.' Mot."), ECF No. 6.  More recently,

Mr. De La Fuente moved to consolidate this case with *Wilson v. DNC Services Corporation*, No.

17-cv-730 (D.D.C. Apr. 19, 2017), overseen by Judge McFadden.  *See generally* Pls.' Mot.

Consolidation, ECF No. 14.  Both of those motions are now ripe for the Court's consideration.

The Court will consider Defendants' motion first, then Mr. De La Fuente's motion.

### III.  DEFENDANTS' MOTION TO DISMISS

Defendants have moved to dismiss Mr. De La Fuente's complaint under Federal Rule of

Civil Procedure 12(b)(6).  A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's

ultimate likelihood of success on the merits, but instead whether a plaintiff has properly stated a

claim.  *See, e.g.*, *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).  When considering such a motion,

the Court accepts the complaint's factual allegations as true and construes them liberally in the

plaintiff's favor.  *See, e.g.*, *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  However,

the Court need not accept the complaint's legal conclusions as true, *see Ashcroft v. Iqbal*, 556

---

[4] Mr. De La Fuente brings his claims on behalf of himself and Rocky 2016.  *See generally* Compl.  As Defendants note, *see* Defs.' Mot. at 1, because Mr. De La Fuente is not an attorney, he may not represent anyone but himself before this Court.  *See Casares v. Wells Fargo Bank, N.A.*, No. 13-cv-1633, 2015 WL 13679889, at *2 (D.D.C. May 4, 2015) ("[P]laintiff, who is proceeding *pro se*, cannot represent the trust in federal court, even as the trustee, as he is not a licensed attorney.").  This Memorandum Opinion will thus treat Mr. De La Fuente as the lone plaintiff.

[5] As Defendants note, Mr. De La Fuente brought each of his claims against both the DNC and Ms. Schultz, based on conduct that occurred while Ms. Schultz was the DNC's chairperson.  *See* Defs.' Mot. at 1 n.1; *see generally* Compl.  And Mr. De La Fuente appears to consider them to be the same entity for purposes of the alleged wrongful conduct.  *See, e.g.*, Compl. ¶ 74 (discussing "Defendants DNC and Schultz's scheme to disadvantage the Presidential campaigns of non-white candidates").  His only allegation regarding Ms. Schultz specifically is that she publicly affirmed the DNC's commitment to "impartiality and evenhandedness," in her capacity as chairperson.  *See* Compl. ¶¶ 36–37.  The Court will thus treat Mr. De La Fuente's claims and factual allegations as relating to both Defendants equally, and Ms. Schultz in her official capacity.

U.S. 662, 678 (2009), nor must it presume the veracity of legal conclusions that are couched as factual allegations, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, [the] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). In other words, the factual allegations "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555–56. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient. *Iqbal*, 556 U.S. at 678. At this stage, the Court is limited to considering "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *Hurd v. D.C. Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).

This Court construes *pro se* complaints liberally. *See Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). Thus, Mr. De La Fuente's complaint "must be held to less stringent standards than formal pleadings drafted by lawyers." *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). Even under this liberal standard, a *pro se* complainant must plead facts that allow the Court to infer "more than the mere possibility of misconduct." *Id.* at 681–82 (quoting *Iqbal*, 556 U.S. at 679). A court considering a *pro se* plaintiff's complaint should look to "all filings, including filings responsive to a motion to dismiss," *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015), to discern whether the plaintiff has "nudged [his] claim[s] across the line from conceivable to plausible," *id.* (quoting *Twombly*, 550 U.S. at 570). "The Court need not," however, "assume the role of the *pro se* plaintiff's advocate." *Mehrbach v. Citibank, N.A.*, 316 F. Supp. 3d 264, 268 (D.D.C. 2018). It need not stalk the record to find

support for Mr. De La Fuente's claims. *See Sun v. D.C. Gov't*, 133 F. Supp. 3d 155, 168 n.6 (D.D.C. 2015).

Mr. De La Fuente asserts six causes of action against Defendants: breach of implied-in-fact contract (Count I), promissory estoppel (Count II), racial discrimination in violation of 42 U.S.C. § 1981 (Count III), civil conspiracy in violation of 42 U.S.C. § 1985 (Count IV), fraudulent misrepresentation (Count V), and negligent misrepresentation (Count VI). *See* Compl. ¶¶ 88–141. The Court addresses each in turn. It concludes that, even under the relaxed *pro se* standard, Mr. De La Fuente has failed to plausibly allege that Defendants violated the law in their treatment of him and his campaign. Mr. De La Fuente may have legitimate gripes with Defendants' apparent favoritism during the Democratic primary, but not every gripe deserves redress in federal court. For the reasons stated below, the Court thus grants Defendants' motion to dismiss and dismisses Mr. De La Fuente's complaint without prejudice.

### A. Implied-In-Fact Contract and Promissory Estoppel

First, the Court considers Mr. De La Fuente's implied-in-fact contract and promissory estoppel claims. *See* Compl. ¶¶ 88-104 (Counts I and II). Defendants' motion argues, at great length, for the dismissal of these claims. *See* Defs.' Mot. at 7–23. And Mr. De La Fuente's opposition brief appears to accept Defendants' arguments. For instance, Mr. De La Fuente states that he "do[es] not believe that [an implied-in-fact contract] was created" by his interactions with Defendants. Pls.' Opp'n at 16 n.1, ECF No. 10. Mr. De La Fuente also notes that Judge McFadden recently dismissed implied-in-fact contract and promissory estoppel claims brought by a scorned political candidate under similar circumstances. *See id.* at 21; *Wilson v. DNC Servs. Corp.*, 315 F. Supp. 3d 392, 398–99 (D.D.C. 2018). Mr. De La Fuente states that he "will not waste effort seeking to counter Judge McFadden's analysis." Pls.' Opp'n at 21. Thus, while Mr.

De La Fuente insists that he "do[es] not abandon these claims," *id.*, he appears to have done just that.

"It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*, 268 F. Supp. 3d 61, 72 (D.D.C. 2017) (quoting *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003)); *see also Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015) ("[Local Rule 7(b) ] is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded." (quoting *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014))); *Head v. Fed. Bureau of Prisons*, 86 F. Supp. 3d 1, 4 (D.D.C. 2015) (applying this principle to a *pro se* plaintiff's opposition brief). If Mr. De La Fuente will not expend the effort to support his claims, the Court will not expend the effort to evaluate them. It dismisses Counts I and II.[6]

---

[6] Regardless, Mr. De La Fuente's factual allegations are insufficient for either claim to survive Defendants' motion to dismiss. To state a claim for an implied-in-fact contract, a plaintiff must show, among other elements, that the plaintiff rendered "valuable services" which "were accepted and enjoyed by" the defendant. *Providence Hosp. v. Dorsey*, 634 A.2d 1216, 1218–19, n.8 (D.C. 1993). Mr. De La Fuente does not identify, with any specificity, any valuable services he rendered to the DNC or Ms. Schultz. And Mr. De La Fuente's allegation that the DNC considered him "a threat to Hillary Clinton's campaign that needed to be curtailed and marginalized," Compl. ¶ 23, undercuts any inference that either Defendant intended to contract with him, another required element of an implied-in-fact contract. *See Wilson*, 315 F. Supp. 3d at 397–99.

Likewise, to state a claim for promissory estoppel, a plaintiff must allege, among other things, that the defendant made a definite promise and the plaintiff reasonably relied on that promise to his detriment. *See Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 44 (D.D.C. 2018); *Headfirst Baseball LLC v. Elwood*, 168 F. Supp. 3d 236, 248 (D.D.C. 2016). Mr. De La Fuente claims that Defendants promised to act in a neutral manner—through the DNC's bylaws rather than through direct communication with him—and to provide "introductions to State Party officials, logistical resources, and general political assistance." *Id.* ¶¶ 15, 32–33.

## B. Racial Discrimination

Next, the Court considers Mr. De La Fuente's claim that Defendants violated 42 U.S.C. §
1981 in denying him the political assistance he believes he was owed. *See* Compl. ¶¶ 105–117
(Count III). Section 1981 "combats racial discrimination by protecting the equal right of '[a]ll
persons within the jurisdiction of the United States' to 'make and enforce contracts' without
respect to race."[7] *Wilson*, 315 F. Supp. 3d at 399 (alteration in original) (quoting 42 U.S.C. §
1981(a)). To state a claim under Section 1981, a plaintiff "must show that: (1) he is a member of
a racial minority group; (2) the defendant intended to discriminate on the basis of his race; and
(3) the discrimination pertained to one of the activities enumerated in the statute." *Kungle v.
State Farm, Fire & Cas. Co.*, 48 F. Supp. 3d 67, 77 (D.D.C. 2014) (quoting *Dickerson v. District
of Columbia*, 806 F. Supp. 2d 116, 119 (D.D.C. 2011)). As relevant here, among the activities
enumerated in the statute are "the making, performance, modification, and termination of
contracts." 42 U.S.C. § 1981(b). While a plaintiff's race is essential to Section 1981 liability,
"[i]n order to pursue a cause of action under § 1981, [a] plaintiff cannot merely invoke his race

---

However, Mr. De La Fuente identifies no specific party officials to whom Defendants offered to
introduce him, nor does he identify when these promised introductions were to take place. He
also does not provide any details about the types of logistical resources and political assistance
he was to receive, or when. Promises to act "neutral" and provide "resources" and "assistance,"
without more detail, are too vague and indefinite to have reasonably induced Mr. De La Fuente
to act in reliance on them. *See Headfirst Baseball*, 168 F. Supp. 3d at 248–50 (rejecting the
plaintiff's promissory estoppel claim where the plaintiff failed to provide "evidence of a clear
promise"); *In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 58, 73 (D.D.C. 2003).

> [7] Section 1981 states:
>
> All persons within the jurisdiction of the United States shall have the same right in
> every State and Territory to make and enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit of all laws and proceedings for the
> security of persons and property as is enjoyed by white citizens, and shall be subject
> to like punishment, pains, penalties, taxes, licenses, and exactions of every kind,
> and to no other.

42 U.S.C. § 1981(a).

in the course of a claim's narrative," but rather "must allege some facts that demonstrate that his race was the reason for defendant's actions." *Bray v. RHT, Inc.*, 748 F. Supp. 3, 5 (D.D.C. 1990) (citing *Jafree v. Barber*, 689 F.2d 640, 643 (7th Cir. 1982); *Jaffe v. Fed. Reserve Bank of Chi.*, 586 F. Supp. 106, 109 (N.D. Ill. 1984)).

Mr. De La Fuente asserts that Defendants deprived him of the "statutory right[]" to "make and enforce contracts on the same basis as White persons." Compl. ¶ 116; *see also* Pls.' Opp'n at 8. He identifies two possible factual bases for this claim: (1) DNC "staff members, agents and/or employees' communication with state party committees," Compl. ¶ 111, caused the South Carolina Democratic Party to deny Mr. De La Fuente access to the state's ballot, and the Nevada Democratic Party to withhold from Mr. De La Fuente the locations of caucus sites, *see id.* ¶¶ 43–44, 51; and (2) Defendants "only selected White Democratic presidential candidates to enter into Voter Data Licensing Agreements and corresponding use of DNC National Voter File Data," *id.* ¶ 80. Defendants respond that this claim cannot be sustained because Mr. De La Fuente has failed to establish the existence of a contract or potential contract that Defendants failed to honor. *See* Defs.' Mot. at 23. Defendants further contend that Mr. De La Fuente has failed to establish that Defendants declined to transact with him because of his race. *See id.*[8] These arguments are well taken.

As with his implied-in-fact contract and promissory estoppel claims, Mr. De La Fuente appears to have abandoned the Section 1981 claims arising from his interactions with state party organizations. His opposition brief fails to address Defendants' arguments for why those claims are legally insufficient. *See* Pls.' Opp'n at 7–10. Dismissal is appropriate on that basis alone.

---

[8] It is uncontested that Mr. De La Fuente, who is Mexican-American, is a member of a racial minority group. He has thus adequately pleaded the first element of a Section 1981 claim.

*See Texas*, 798 F.3d at 1110; *Head*, 86 F. Supp. 3d at 4; *Stephenson v. Cox*, 223 F. Supp. 2d 119, 121 (D.D.C. 2002).

Setting his concession aside, Mr. De La Fuente has failed to show that his interactions with state party organizations support Section 1981 liability. To state a Section 1981 claim, a plaintiff "must initially identify an impaired 'contractual relationship' under which [he] has rights"; relief is appropriate when "racial discrimination blocks the creation of a contractual relationship [or] . . . impairs an existing contractual relationship" involving the plaintiff. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (citation omitted). Here, Mr. De La Fuente has not adequately identified the contractual relationships underlying his interactions with the state party organizations. He alleges that the Nevada organization "refused to provide" him with the locations of its caucus sites because the DNC broadcasted that he was not an "endorsed" or "sanctioned" candidate. *See* Compl. ¶¶ 43–46. But he does not allege that an existing contractual relationship required Nevada to disclose the caucus site locations, or required the DNC to "sanction" him. *See id.* ¶ 46. Nor does he allege that he sought a contractual relationship that would have entitled him to those benefits. In fact, Mr. De La Fuente provides no details at all regarding how he attempted to obtain Nevada's caucus site locations, or the significance of that information. Similarly, Mr. De La Fuente alleges that the South Carolina organization denied him ballot access, but he admits that the state party's executive committee took this action because it "was not personally familiar with [him]," *id.* ¶ 51, rather than because of his race. Mr. De La Fuente implies that the DNC had a contractual obligation to introduce him to the relevant South Carolina officials, *see id.*, but as discussed above he has failed to plausibly allege—and in fact has waived—the existence of such a contract. And he does not

otherwise claim to have attempted to contract with the DNC or the South Carolina organization for access to the ballot.[9]

Put simply, the Court has no choice but to dismiss these allegations because Mr. De La Fuente has not "presented a scintilla of evidence that he was prevented from entering into a 'contractual' relationship with" Defendants or the state organizations "due to his race."[10] *Bray*, 748 F. Supp. at 5; *cf. Morris v. Office Max, Inc.*, 89 F.3d 411, 414 (7th Cir. 1996) (rejecting the

_____

[9] Defendants invoke the doctrine of issue preclusion as an alternative to bar Mr. De La Fuente's claim involving the South Carolina organization. *See* Defs.' Mot. at 25–26. The doctrine dictates that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" *Sheppard v. District of Columbia*, 791 F. Supp. 2d 1, 5 (D.D.C. 2011) (quoting *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992)). Issue preclusion applies if three criteria are met: (1) in the prior litigation, the issue was "contested by the parties and submitted for judicial determination;" (2) the issue was "actually and necessarily determined by a court of competent jurisdiction;" and (3) "preclusion in the second case [does] not work a basic unfairness to the party bound by the first determination." *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 301 (D.C. Cir. 2015) (quoting *Yamaha*, 961 F.2d at 254). In 2016, Mr. De La Fuente sued the South Carolina Democratic Party, alleging that it discriminated against him on the basis of national origin by denying him access to the state's Democratic presidential primary ballot. *See De La Fuente v. S.C. Democratic Party*, No. 16-cv-322, 2017 WL 3085750, at *1, 4 (D.S.C. July 20, 2017). As he does here, Mr. De La Fuente argued that the organization denied him access because of the "political and electoral threat that [his] Hispanic heritage posed to Hillary Clinton." *Id.* at *4 (internal quotation marks omitted). The district court dismissed his claim with prejudice at the summary judgment stage, holding that he "provide[d] no evidence in support of this argument," other than his conclusory assertion of discrimination. *Id.* That court's decision satisfies the requirements for issue preclusion as to whether Mr. De La Fuente was denied access to the state's ballot on discriminatory grounds: The issue was contested and decided by a court of competent jurisdiction, and Mr. De La Fuente provides no reason why application of the doctrine would be unfair. *See Canonsburg Gen. Hosp.*, 807 F.3d at 301. Mr. De La Fuente is thus precluded from relitigating his inability to gain ballot access in South Carolina.

[10] It is true that a plaintiff "need not rely on a contractual relationship to proceed with his Section 1981 claim." *Mazloum v. D.C. Metro. Police Dep't*, 522 F. Supp. 2d 24, 39 (D.D.C. 2007). Mr. De La Fuente could, for instance, argue that he was deprived of "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Mr. De La Fuente has not raised that argument here, however, and he has not explained how the actions of the DNC and the state party organizations deprived him of the "full and equal benefit" of the law.

plaintiffs' Section 1981 claim where they "never sought to enter into a contractual relationship" with the defendant); *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1267 (10th Cir. 1989) (holding that the plaintiff's "vague and conclusory allegation" that the defendants "interfered with his 'prospective business opportunities'" did not state a Section 1981 claim); *Williams v. Fed. Nat'l Mortg. Ass'n*, No. 05-cv-1483, 2006 WL 1774252, at *5 (D.D.C. June 26, 2006) (holding that a "plaintiff's allegations of general promises and assurances by defendants of a future business relationship or opportunities to do business do not identify a contractual interest under § 1981").[11]

It is a closer call, but Mr. De La Fuente has also failed to show that Defendants violated Section 1981 by depriving him of access to the DNC's Voter Data File. True, a Section 1981 claim may arise "when racial discrimination blocks the creation of a contractual relationship." *Domino's Pizza*, 546 U.S. at 476. And Mr. De La Fuente has alleged that Defendants refused to contract with him for access to the DNC's Voter Data File, while granting access to white candidates. *See* Compl. ¶¶ 80–82. However, Mr. De La Fuente has not alleged "facts that demonstrate that his race was the reason for [Defendants'] action." *Morris v. Carter Glob. Lee, Inc.*, 997 F. Supp. 2d 27, 37 (D.D.C. 2013) (quoting *Bray*, 748 F. Supp. at 5).

Mr. De La Fuente's claim relies, for the most part, on his overall theory of the case: Defendants "wanted to deprive Hispanic Democrats of the opportunity to cast ballots for anyone other than their chosen White candidate—Hillary Clinton." Compl. at 2. More specifically, "Hillary Clinton could not be guaranteed the Democratic Party's nomination without garnering a

---

[11] Mr. De La Fuente also suggests that he was discriminatorily denied access to "organized candidate meetings . . . debates and town hall meetings." Compl. ¶ 52–53. But he admits that that access was "contingent on objective factors" apart from race, *id.* ¶ 53, and again, he fails to tie these conclusory allegations to any existing or prospective contractual relationship.

significant majority of Hispanic-American votes," votes that "had nowhere to go but to [her] if the DNC could successfully marginalize [Mr.] De La Fuente." *Id.* ¶ 20. Mr. De La Fuente argues that this motive drove Defendants to deny him access to the Voter Data File. *See id.* ¶¶ 23, 83–84.

This theory, however, suffers from a major flaw: It is not supported by any factual allegations. Mr. De La Fuente points to no statements made or actions taken by Defendants indicating that they viewed him as a threat because of his race. Mr. De La Fuente alleges "on information and belief" that "internal polling" in late-2015 indicated that Secretary Clinton needed Hispanic-American votes to guarantee victory in the primary. *Id.* ¶ 20. But Mr. De La Fuente identifies no facts indicating that Defendants acted on that information in a discriminatory way. He also relies on a leaked memorandum "*addressed to* the DNC," *id.* ¶ 65 (emphasis added), demonstrating "the pre-ordained elevation of Hillary Clinton as the DNC's 2016 presidential nominee," *id.* ¶¶ 69. But by Mr. De La Fuente's own admission, the memorandum was not generated by Defendants. *See id.* ¶ 65. And more importantly, Mr. De La Fuente does not allege that the memorandum contained any discussion of marginalizing minority candidates to secure more minority votes for Secretary Clinton. Rather, the memorandum indicates "a bias in favor of only one candidate" over *all others*, minority and non-minority alike. *Id.* ¶ 71. Mr. De La Fuente "merely invoke[s] his race in the course of [his] narrative" with respect to these allegations, which is insufficient to state a Section 1981 claim. *Bray*, 748 F. Supp. at 5; *see also Mears v. Allstate Indemnity Co.*, 336 F. Supp. 3d 141, 150 (E.D.N.Y. 2018) ("It is not enough merely to assert that the defendant took adverse action against the plaintiff, and that the action was a product of racial animus." (quoting *Dickerson v. State Farm Fire & Cas. Co.*, No. 95-cv-10733, 1996 WL 445076, at *3 (S.D.N.Y. Aug. 1, 1996))).

Perhaps recognizing that he lacks direct evidence of discrimination, Mr. De La Fuente also alleges circumstantial evidence. He contends that Defendants granted "access to certain information," including, presumably, the Voter Data File, to "all similarly situated White presidential candidates," while depriving Mr. De La Fuente of that access. Compl. ¶ 48; *see also id.* ¶ 80 ("Defendant DNC only selected Caucasian Democratic presidential candidates" for "use of the DNC National Voter File Data"). Again, to state a claim under Section 1981, a plaintiff's allegations must give rise to an inference of intentional discrimination. A plaintiff may raise such an inference by "showing that he was treated less favorably than another similarly situated person of a different race." *Wilson*, 315 F. Supp. 3d at 400 (citing *Brown v. Sessions*, 774 F.3d 1016, 1023 (D.C. Cir. 2014)).

To raise an inference of discrimination through that mechanism, the plaintiff must show that the similarly situated comparator is "nearly identical" to the plaintiff. *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).[12] "A person is similarly situated to the plaintiff if he or she possesses all the relevant characteristics the plaintiff possesses except for the characteristic about which the plaintiff alleges discrimination." *Lucke v. Solsvig*, 912 F.3d 1084, 1087 (8th Cir. 2019) (citing *Barstad v. Murray Cty.*, 420 F.3d 880, 886–87 (8th Cir. 2005)). "What constitutes a 'relevant respect' or characteristic varies based on the context." *Id.* (citing *Barstad*, 420 F.3d at 884–85; *Chappell v. Bilco Co.*, 675 F.3d 1110, 1119 (8th Cir. 2012)). For instance, in the employment context—the area most ripe for Section 1981 claims—

---

[12] While *Neuren* concerned racial discrimination under Title VII of the Civil Rights Act of 1964, *see id.* at 1508, rather than under section 1981, the pleading standards for establishing Section 1981 discrimination track those for establishing Title VII discrimination. *See Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017); *Brown*, 774 F.3d at 1022.

similarly situated employees "must have dealt with the same supervisor [as the plaintiff], have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Morris*, 113 F. Supp. 3d 289, 296 (D.D.C. 2015) (alteration in original) (quoting *Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 70 (D.D.C. 2005), *aff'd*, 187 Fed. App'x 1 (D.C. Cir. 2006)).

To support a comparator theory at the motion to dismiss stage, a plaintiff must allege facts that plausibly support an inference of discrimination under that standard. Thus, the D.C. Circuit held that a plaintiff raised an inference of discrimination when "she identified a similarly-situated employee who is not in her protected class and explained why she has equivalent qualifications." *Brown*, 774 F.3d at 1023; *see also Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467, 469 (D.C. Cir. 2017) (holding that a minority-owned shipping company stated a Section 1981 claim when it alleged that the defendant treated the plaintiff "less favorably than similarly situated white-owned companies," it identified one of those similarly situated companies, and it alleged that the plaintiff "attained equal or lower shipping prices and similar assurances regarding shipping security"); *Dickerson v. District of Columbia*, 315 F. Supp. 3d 446, 454 (D.D.C. 2018) (holding that the black plaintiff stated a Section 1981 claim when he alleged that "a white woman with less education and experience than [him] was selected to fill his position"). And the Fifth Circuit held the same when a minority-owned car repair shop alleged that the defendant "told [it] that [the defendant] was not admitting body shops into its Direct Repair Program but . . . then admitted a non-minority-owned body shop with inferior equipment that did not meet [the defendant's] 'qualifications.'" *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 387 (5th Cir. 2017). But in the same case, the minority-

owned shop failed to plead discriminatory intent with respect to a different defendant when it did not allege "specific instances when [it] was refused a contract but a similarly situated non-minority owned body shop was given a contract." *Id.* (citing *Hall v. Cont'l Airlines, Inc.*, 252 F. App'x 650, 653–54 (5th Cir. 2007) (unpublished)); *see also Mesumbe v. Howard Univ.*, 706 F. Supp. 2d 86, 92 (D.D.C. 2010) (holding that the plaintiff's "conclusory allegation that similarly situated students of different national origin, ethnicity, and race [were] treated differently and more favorably" was insufficient when the plaintiff did not describe those students or "indicat[e] the intent behind these disparate outcomes."). In short, a complaint "assert[ing] nothing more than a 'mere possibility of [discriminatory] misconduct'" is insufficient to state a Section 1981 claim. *Ridley v. VMT Long Term Care Mgmt., Inc.*, 68 F. Supp. 3d 88, 91 (D.D.C. 2014) (quoting *Iqbal*, 556 U.S. at 679).

Here, Mr. De La Fuente's allegations fail to rise above the mere possibility of discrimination. Mr. De La Fuente alleges that the DNC restricted access to the Voter Data File "to candidates who entered into [joint fundraising agreements]" with the DNC. Compl. ¶ 75. He further alleges that "[o]nly Caucasian candidates were informed of this requirement." *Id.* ¶ 78. And he makes the conclusory assertion that these candidates were "similarly situated" to him. *Id.* ¶ 48. But apart from Secretary Clinton, he never identifies, or even nebulously describes, a similarly situated white candidate who executed a joint fundraising agreement and received access to the Voter Data File. *Cf. Mpras v. District of Columbia*, 74 F. Supp. 3d 265, 272 (D.D.C. 2014) (rejecting the plaintiff's "conclusory allegation" that similarly situated individuals received an identification card that he was denied, because the complaint "offere[ed] no facts about who these other persons are or how they were similarly situated"). And as Defendants note, public filings indicate that the DNC only executed joint fundraising agreements with

Hillary Clinton and Bernie Sanders. *See* Suppl. Decl. Elisabeth Frost Ex. C (listing, in the

DNC's Statement of Organization filed with the FEC, organizations associated with Secretary

Clinton and Senator Sanders as "Joint Fundraising Representative[s]"), ECF No. 13-4.[13] Mr. De

La Fuente does not allege that he was similarly situated to Secretary Clinton or Senator Sanders.

Nor could he; Secretary Clinton and Senator Sanders had far greater political experience,

fundraising success, and public support (as reflected in polling data). Even taking Mr. De La

Fuente's factual allegations as true, the Court cannot infer that Defendants acted with

discriminatory intent, because Mr. De La Fuente does not plausibly allege that he was treated

differently than similarly situated white candidates.[14]

Mr. De La Fuente is understandably frustrated with Defendants' favoritism towards

Secretary Clinton. However, favoritism is not synonymous with discrimination, particularly

where both minority and non-minority candidates are disfavored. *See id.* ¶ 41 ("The DNC

devoted its considerable resources to supporting Hillary Clinton above any of the other

Democratic candidates . . . .");[15] *cf McNair v. District of Columbia*, 213 F. Supp. 3d 81, 87

---

[13] As Defendants note, Defs.' Reply at 10 n.5, ECF No. 13, this Court may take judicial notice of the DNC's public filings with the FEC, without converting Defendants' motion to dismiss to one for summary judgment. *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 133 F. Supp. 3d 70, 84–85 (D.D.C. 2015).

[14] Mr. De La Fuente refers in his briefing to a "[d]isfavored" white candidate, "O'Malloy." Pls.' Opp'n at 9. The Court assumes that this is a reference to former Maryland Governor Martin O'Malley. Along with Governor O'Malley, the Democratic primary race involved other white candidates—including Lincoln Chafee and Jim Webb—who did not gain the same traction as Secretary Clinton or Senator Sanders. *See* FEC Statement of Candidacy, Lincoln Davenport Chafee (June 16, 2015), http://docquery.fec.gov/pdf/737/15951475737/ 15951475737.pdf; FEC Statement of Candidacy, James Webb (Oct. 30, 2015), http://docquery .fec.gov/pdf/994/201510309003259994/201510309003259994.pdf. Mr. De La Fuente does not allege that these candidates were treated any differently than he was with respect to the DNC's Voter Data File.

[15] Mr. De La Fuente alleges that Defendants became concerned with his candidacy only upon "the emergence of Bernie Sanders as a significant threat to Hillary Clinton's early nomination." *Id.* ¶ 21. At that point, Mr. De La Fuente's "candidacy threatened to throw the

(D.D.C. 2016) (holding that the plaintiff failed to raise an inference of gender discrimination where her allegations "suggest[ed] that, at best, she was treated differently from all other employees—which presumably includes both men and women"). Mr. De La Fuente's allegations "are consistent with an arbitrary, *but not racially discriminatory*, decision-making process." *Nanko*, 850 F.3d at 469 (emphasis in original) (Brown, J., dissenting). They do not support Section 1981 liability, thus the Court dismisses Count III.[16]

## C. Civil Conspiracy

The Court next considers Mr. De La Fuente's claim that Defendants have violated 42 U.S.C. § 1985 by executing a conspiracy to "hamper, impede and sabotage [his campaign] through intimidation and political threats." Compl. ¶ 121 (Count IV). While Section 1985 establishes civil liability for multiple types of conspiracies, only Section 1985(3) is relevant here.[17] That provision prohibits a conspiracy to deprive a person of "equal protection" or "equal

---

nomination to Bernie Sanders and thereby defeating [sic] the DNC's intended nominee." *Id.* Thus, Mr. De La Fuente appears to concede that Defendants targeted him not solely because of his race, or because he was a direct threat to win the nomination, but because he would help a disfavored white candidate.

[16] Both parties note that Judge McFadden recently allowed a Section 1981 claim to proceed based on similar allegations. *See Wilson*, 315 F. Supp. 3d at 399–400. However, *Wilson* involved a different plaintiff and, presumably, different briefing. Because of the case-by-case nature of Section 1981 claims, it is not uncommon for different courts to reach different results when faced with what appear to be similar circumstances. And to the extent *Wilson* may be read to hold, as a general matter, that two candidates were "similarly situated" for Section 1981 purposes because they registered with the FEC and contacted the DNC, *see id.* at 400, this Court respectfully disagrees.

[17] Mr. De La Fuente does not specify in his complaint or briefing what type of conspiracy he is alleging under Section 1985. But only Section 1985(3) is pertinent to the facts and claims contained in his complaint. *See Wilson*, 315 F. Supp. 3d at 401 (addressing similar allegations under Section 1985(3)). Section 1985's other provisions cover conspiracies to prevent a federal officer from performing his or her duties, *see* 42 U.S.C. § 1985(1), and to obstruct justice by interfering with parties, witnesses, or jurors, *see id.* § 1985(2). Mr. De La Fuente has not alleged that he held federal office at any time during the relevant period, nor does he allege any obstruction of court proceedings.

privileges and immunities" under the law. 42 U.S.C. § 1985(3).[18] To state a claim under Section 1985(3), a plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Wilson*, 315 F. Supp. 3d at 400–01 (quoting *Pope v. Bond*, 641 F. Supp. 489, 498 (D.D.C. 1986)).

Mr. De La Fuente's filings are unclear as to the precise bases for this claim, but the complaint seems to indicate that Mr. De La Fuente believes Defendants' conspiracy or conspiracies "depriv[ed]" him "from competing in [Nevada's] Presidential caucus," *see* Compl. ¶¶ 44–46, caused him to be excluded from "one or more state Presidential primary election ballots," including the South Carolina ballot, *see id.* ¶ 47, and prevented him from accessing the DNC's Voter Data File, *see id.* ¶¶ 74–82. According to Mr. De La Fuente, these alleged actions were part of Defendants' broader scheme to "target[] minority candidates who threatened to

---

[18] Section 1985(3) states that it is unlawful for:

> two or more persons in any State or Territory [to] conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . .

42 U.S.C. § 1985(3). Section 1985(3) also states that it is unlawful for:

> two or more persons . . . to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy . . . .

*Id.*

decrease the number of minority votes cast for Hillary Clinton." *Id.* ¶ 41. Defendants correctly argue that these allegations, while possibly indicating favoritism on the part of Defendants, "fail[] to plausibly allege a conspiracy . . . ." Defs.' Mot. at 27.

The complaint lays out a general theory—Defendants targeted Mr. De La Fuente because they believed he would steal Hispanic-American votes from Secretary Clinton—but it fails to connect that theory to the elements of a Section 1985 claim. Most fundamentally, Mr. De La Fuente does not adequately plead the existence of an agreement to harm him, an "essential element of a conspiracy claim." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 113 (D.D.C. 2010) (quoting *Graves v. United States*, 961 F. Supp. 314, 320 (D.D.C. 1997)). He simply makes the conclusory assertion that the DNC acted "in conjunction with Nevada party officials," Pls.' Opp'n at 14, and that the DNC "communicated" with other "state party affiliate[s]," Compl. ¶ 47. But a plaintiff must "set forth more than just conclusory allegations of an agreement." *Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004) (holding that the plaintiff failed to plausibly allege the existence of a conspiracy where he stated that the defendants "agreed among themselves to subject him to discriminatory acts," but he "put[] forth no facts suggesting that the defendants were acting in concert in furtherance of a shared goal" (internal quotation marks omitted)). At the very least, the complaint must allege "when or how such an agreement was brokered," *Acosta*, 711 F. Supp. 2d at 113, information lacking here. Even if the Court accepts Mr. De La Fuente's facts as true (e.g. that the DNC declined to "endorse" him as a candidate, to prevent him from campaigning in certain states), the Court still could not infer an agreement among multiple entities or individuals to harm him. *See Acosta*, 711 F. Supp. 2d at 114 (rejecting the plaintiffs' civil conspiracy claim where their allegations, "even assuming that those allegations [we]re true, could just as easily be the result of [the

defendants'] independent actions"); *Kurd v. Republic of Turkey*, No. 18-cv-1117, 2019 WL 1243731, at *19 (D.D.C. Mar. 18, 2019) (holding that the plaintiffs failed to state a Section 1985 claim, even if the defendants "had the common goal" of "curtail[ing]" the plaintiffs' rights, because the plaintiffs "provide[d] no additional support for the existence of an agreement"). In short, Mr. De La Fuente's "general allegation of conspiracy" is not sufficiently detailed to state a Section 1985 claim.[19] *Wilson*, 315 F. Supp. 3d at 401. For this reason, the Court dismisses Count IV.[20]

### D. Fraudulent and Negligent Misrepresentation

Finally, the Court considers Mr. De La Fuente's claims that Defendants made fraudulent and negligent misrepresentations.[21] *See* Compl. ¶¶ 126–140 (Counts V and VI). To establish a claim for fraudulent misrepresentation under District of Columbia law, a plaintiff must allege: "(1) that a false representation was made, (2) in reference to a material fact, (3) with knowledge of its falsity, (4) with intent to deceive, and (5) action taken in detrimental reliance upon the representation." *Sibley v. St. Albans Sch.*, 134 A.3d 789, 808–09 (D.C. 2016) (citing *Va. Acad.*

---

[19] Even if Mr. De La Fuente plausibly alleged the existence of a conspiracy, his Section 1985 claim would still fail because, as discussed regarding his Section 1981 claim, he has failed to plausibly allege that Defendants' actions arose from "some class-based, invidiously discriminatory animus." *Atherton*, 567 F.3d at 688.

[20] Mr. De La Fuente argues that he has stated a Section 1985 claim "for the same reason and on similar facts that Judge Trevor N. McFadden recently upheld Willie Wilson's Section 1985 claims . . . ." Pls.' Opp'n at 10; *see Wilson*, 315 F. Supp. 3d at 401–02. But, seemingly recognizing that Mr. Wilson's Section 1985 allegations differ substantially from his own, Mr. De La Fuente also seeks to amend his complaint to add what appear to be identical allegations to Mr. Wilson's. Pls.' Opp'n at 13. Mr. De La Fuente may add these allegations to a proposed amended complaint, should he choose to seek leave to file one.

[21] Mr. De La Fuente appears to have abandoned his fraudulent misrepresentation claim at the briefing stage; he does not address it in his opposition brief. *See generally* Pls.' Opp'n. Regardless, the same deficiencies that are fatal to his negligent misrepresentation claim are fatal to his fraudulent misrepresentation claim.

*Clinical Psychologists v. Grp Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1233 (D.C. 2005)). "[T]he elements of a negligent misrepresentation claim are the same as those of a fraudulent misrepresentation claim, except a negligent misrepresentation claim does not include the state of mind requirements of fraud." *Regan v. Spicer HB, LLC*, 134 F. Supp. 3d 21, 38 (D.D.C. 2015). And "[b]oth negligent misrepresentation and fraud require . . . reasonable reliance." *Venable LLP v. Overseas Lease Grp., Inc.*, No. 14-cv-2010, 2015 WL 4555372, at *4 (D.D.C. July 28, 2015); *see also In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 58, 74 (D.D.C. 2003); *Sundberg v. TTR Reality, LLC*, 109 A.3d 1123, 1131 (D.C. 2015).

In addition, when a plaintiff alleges fraudulent or negligent misrepresentation, as Mr. De La Fuente does here, the plaintiff must satisfy the more stringent pleading requirements of Federal Rule of Civil Procedure 9(b). *See Boomer Dev., LLC v. Nat'l Ass'n Home Builders U.S.*, 325 F.R.D. 6, 12 (D.D.C. 2019); *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 206 (D.D.C. 2016). Federal Rule 9(b) requires that a complaint "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see, e.g.*, *Jefferson v. Collins*, 905 F. Supp. 2d 269, 286 (D.D.C. 2012); *3D Glob. Sols., Inc. v. MVM, Inc.*, 552 F. Supp. 2d 1, 7–9 (D.D.C. 2008); *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 254 (D.D.C. 2004). Put simply, the complaint must "state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *United States ex rel. Williams v. Martin–Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (internal quotation marks omitted) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994)). The complaint must also "identify individuals allegedly involved in the fraud." *Id.* at 1256. Defendants argue that the complaint falls short of that standard, Defs.' Mot. at 31–32, and, again, the Court agrees.

Mr. De La Fuente has failed to satisfy Rule 9(b)'s particularity requirements. He alleges that a DNC employee, "Ms. Dacey," stated in "correspondence" with Mr. De La Fuente that the DNC would provide "introductions to State Party officials, logistical resources, and general political assistance." Compl. ¶ 15. Mr. De La Fuente fails, however, to identify when this correspondence occurred. And more fundamentally, he fails to sufficiently describe the correspondence's content. "Logistical resources" could cover anything from discounted rental cars, to free office space and a Keurig machine, to a full secretarial team. Similarly, "general political assistance" could refer to a "Campaigning for Dummies" brochure, or it could mean that the DNC would provide Mr. De La Fuente access to its top political operatives. And it is unclear when the promised "introductions" would occur, and to which level of "State Party officials" Mr. De La Fuente would be given access. The complaint's conclusory allegations are simply not adequate under Rule 9(b). *See Boomer Dev., LLC v. Nat'l Ass'n Home Builders U.S.*, 258 F. Supp. 3d 1, 17 (D.D.C. 2017) (holding that allegations that the defendant promised "assurances," "assistance," and "support," could not support a misrepresentation claim).

Mr. De La Fuente's allegation that the DNC "expressly agreed to provide all registered Democratic Presidential candidates and campaigns access to the DNC's voter data base [sic] and other logistical assistance, guidance, [and] resources" is similarly deficient. Compl. ¶ 32. Mr. De La Fuente does not identify who specifically made this representation, when it was made, and what types of "guidance" and "resources" fell within its scope. Rule 9(b) requires more detail. *See, e.g.*, *Carter v. Bank of Am., N.A.*, 888 F. Supp. 2d 1, 14 (D.D.C. 2012) ("[T]he plaintiff has not stated with any particularity the circumstances constituting fraud, as required by Rule 9(b), because she has not provided even approximate dates of when fraudulent statements were made to her nor the specific nature of the assurances.").

Finally, Mr. De La Fuente relies on the DNC's statement—in Article 5, Section 4 of its Charter and Bylaws—that its "National Chairperson" would "exercise impartiality and evenhandedness" between campaigns; in Mr. De La Fuente's words, a "strict policy of neutrality." Compl. ¶¶ 28, 33, 40; *see also id.* ¶¶ 36, 37, 40 (referencing "public declarations of neutrality and impartiality" by DNC employees, including Ms. Schultz). While Mr. De La Fuente does a better job of describing this alleged misrepresentation, he fails to plausibly allege that his reliance on it was reasonable. He seems to claim that he believed, to the tune of $6.7 million dollars, that Defendants' general policy of "neutrality" would afford him access to the same tools in the DNC's arsenal as all other candidates, and would ensure that the DNC would not "endorse" certain candidates over him. *See* Compl. ¶¶ 28–34, 41, 48. But he fails to explain why the DNC's bylaw would reasonably induce that belief. "Neutrality" is a broad, vague term that does not necessarily mean equality of opportunity. Mr. De La Fuente admits as much: He states that "invitation[s] to certain specific debates and town hall meetings were contingent on objective factors, such as previous polling results," *Id.* ¶ 53, but he does not argue that he believed, based on the DNC's policy of neutrality, that he would be entitled to attend all debates. That belief, based on such a general statement, would be unreasonable. Mr. De La Fuente's expectation that the DNC's bylaw entitled him to the same resources as all other candidates is equally unreasonable. *See In re U.S. Office Prods.*, 251 F. Supp. 2d at 64, 74–75 (holding that the plaintiffs' "blind reliance" on the "indefinite" promise that they would be made financially whole was not reasonable); *Venable*, 2015 WL 4555372, at *4–5 (holding that the defendant's statement that its "legal fees and expenses would be kept to a minimum" was a "generalized statement[] of optimism" that could not support a misrepresentation claim); *cf. Berg v. Obama*,

574 F. Supp. 2d 509, 529 (E.D. Pa. 2008) (holding that a political party's "statements of principle and intent" are not enforceable promises).

In short, Mr. De La Fuente has failed to plead his claims with sufficient particularity. For these reasons, the Court dismisses Counts V and VI. However, "[w]here a pleading does not satisfy the heightened requirements of Rule 9(b), the court should freely grant leave to amend." *Boomer*, 325 F.R.D. at 15 (citing *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996)). The Court will afford Mr. De La Fuente another opportunity to remedy the complaint's defects.

## IV. MR. DE LA FUENTE'S MOTION TO CONSOLIDATE

While Defendants' motion to dismiss was pending, and nearly one year after filing his complaint, Mr. De La Fuente moved to consolidate this case with *Wilson*, No. 17-cv-730 (D.D.C. Apr. 19, 2017), overseen by Judge McFadden.[22] *See* Pls.' Mot. Consolidation, ECF No. 14. "[C]onsolidation is a purely ministerial act which . . . relieves the parties and the Court of the burden of duplicative pleadings and Court orders." *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 148 (D.D.C. 2002). This Court has broad discretion in deciding whether to consolidate actions that involve "common question[s] of law or fact." Fed. R. Civ. P. 42(a); *Clayton v. District of Columbia*, 36 F. Supp. 3d 91, 93 (D.D.C. 2014). *Clayton* summarized the factors a court must weigh in determining whether to exercise that discretion:

> [T]he court should consider whether judicial efficiency is best served by consolidation. The court generally weighs the saving of time and effort that consolidation would produce against any inconvenience, delay, or expense that consolidation would cause. Courts also consider (1) whether the relief sought varies substantially between the two actions; (2) whether defendants are being sued

---

[22] Local Rule 40.5(d) dictates that "[m]otions to consolidate cases assigned to different judges of this Court shall be heard and determined by the judge to whom the earlier-numbered case is assigned." LCvR 40.5(d). *Wilson* is the earlier-numbered case here, so Mr. De La Fuente should have filed his motion to consolidate with Judge McFadden. He does not appear to have done so. Thus, in the interest of judicial economy, this Court will rule on Mr. De La Fuente's motion.

in different capacities; and (3) what would be gained by consolidation and what injury would be suffered by failure to consolidate.

36 F. Supp. 3d at 94 (quoting *Frederick v. S. Star Cent. Gas Pipeline, Inc.*, No. 10-1063, 2010 WL 4386911, at *2 (D. Kan. Oct. 29, 2010)); *see also Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys.*, 770 F. Supp. 2d 283, 286 (D.D.C. 2011) ("[D]istrict courts must weigh the risk of prejudice and confusion wrought by consolidation against the risk of inconsistent rulings on common factual and legal questions, the burden on the parties and the court, the length of time, and the relative expense of proceeding with separate lawsuits if they are not consolidated."). Here, those factors weigh against consolidation.

Mr. De La Fuente asserts that this case and *Wilson* "involve identical facts and legal issues," Mot. Consolidation at 10, but that is an overstatement. It is true that the two cases may have *some* factual issues in common. For instance, they both raise the question of whether the DNC targeted minority candidates who it believed would steal votes from Secretary Clinton. *See, e.g.*, Compl. ¶ 20; Second Am. Compl. ("*Wilson* Compl.") ¶ 7, *Wilson*, No. 17-cv-730, ECF No. 25. And, as Mr. De La Fuente notes, the two cases share certain causes of action against the DNC. *See, e.g.*, Compl. ¶¶ 88–124 (asserting breach of contract, promissory estoppel, Section 1981, and Section 1985 claims); *Wilson* Compl. ¶¶ 67–104 (same).

But therein lies the problem with Mr. De La Fuente's motion. Those causes of action turn on facts unique to each plaintiff. The two claims currently at issue in *Wilson* are for racial discrimination under Section 1981, and civil conspiracy under Section 1985. *See Wilson*, 315 F. Supp. 3d at 402. *Wilson*'s Section 1981 claim arises from Mr. Wilson's alleged attempt to contract with the DNC for its Voter Data File. *Id.* Mr. Wilson's actions towards the DNC, and the DNC's alleged rejection of Mr. Wilson's overtures, have no bearing on whether *Mr. De La Fuente* can meet the elements of a Section 1981 claim. Likewise, *Wilson*'s Section 1985 claim

arises from an alleged conspiracy between the Secret Service and the DNC to keep Mr. Wilson from taking the stage at a specific campaign event in South Carolina. *Id.* at 401–02. While Mr. De La Fuente suggests that he attended the same rally and suffered the same injury as Mr. Wilson, he has not yet provided plausible allegations to that effect. And if he is able to state a Section 1985 claim arising from that event, he must ultimately provide evidence that the DNC conspired to harm *him*.[23] At this time, it is too speculative to conclude that the two Section 1985 claims share common issues of fact, or even that Mr. De La Fuente can pursue any such claim.

Thus unlike, for instance, two cases challenging the same agency decision based on the same administrative record, *see En Fuego Tobacco Shop LLC v. FDA*, 356 F. Supp. 3d 1, 9–11 (D.D.C. 2019), this case and *Wilson* will likely involve different sets of facts. *See Blasko v. Wash. Metro. Area Transit Auth.*, 243 F.R.D. 13, 16–17 (D.D.C. 2007) (declining to consolidate two cases for trial when "the plaintiffs' damages claims may require distinct evidentiary support"); *Stewart v. O'Neill*, 225 F. Supp. 2d 16, 21 (D.D.C. 2002) (declining to consolidate three cases when the plaintiff argued merely that the cases involved similar types of discrimination by agents under "the bureaucratic umbrella of the Department of the Treasury"). The factual differences weigh against consolidation.

Not to mention, this case and *Wilson* are at different stages. *Wilson* is through discovery, and the DNC has filed a motion for summary judgment in that case. *See* DNC's Mot. Summ. J., *Wilson*, ECF No. 52; Joint Status Report, *Wilson*, ECF No. 47. Here, Mr. De La Fuente is stuck at the pleading stage. To the extent Mr. De La Fuente believes that consolidating his case with *Wilson* will allow him to piggyback on Mr. Wilson's action and move straight through discovery,

---

[23] Not to mention, as discussed above, he must establish that his South Carolina-related claims are not barred by issue or claim preclusion. *See* n.9.

he is mistaken. "[C]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–97 (1933); *see also Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1327 (2016) ("[A]ctions do not lose their separate identity because of consolidation." (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2382 (3d ed. 2008))). It is thus unclear, at least for now, how judicial economy would be enhanced by consolidation. *See Klayman v. Judicial Watch, Inc.*, 255 F. Supp. 3d 161, 174–75 (D.D.C. 2017) (holding that consolidation of two cases was improper when one case was set for trial and the other had yet to proceed to discovery); *Stewart*, 225 F. Supp. 2d at 21 (denying the plaintiffs' motion to consolidate one case involving a post-settlement dispute, one case in which "substantial discovery" had taken place, and one case at the pleading stage, because consolidation of cases "in very different stages of litigation" does not serve judicial efficiency). And consolidation, if it delays the *Wilson* proceedings, could potentially prejudice the DNC.[24] Given these considerations, the Court exercises its discretion under Federal Rule 42, and denies Mr. De La Fuente's motion to consolidate.

---

[24] The Court is also sympathetic to Defendants' argument that Mr. De La Fuente appears to be engaging in gamesmanship (if not judge shopping) by filing his motion now. *See* Defs.' Opp'n Mot. Consolidation at 10, ECF No. 17. Mr. De La Fuente has known of *Wilson* since at least June 11, 2018, when Defendants referenced the case in their motion to dismiss. Defs.' Mot. at 1 n.1. Yet he waited to seek consolidation until Judge McFadden allowed certain of Mr. Wilson's claims to proceed to discovery. And Mr. De La Fuente's briefing indicates that this timing was not lost on him. *See* Pls.' Mot. Consolidation at 12 (asserting that Judge McFadden will "be in a position to quickly adjudicate Defendants' pending motion to dismiss in a manner consistent with" *Wilson*). Regardless of Mr. De La Fuente's motives, however, consolidation is inappropriate on more traditional Rule 42 grounds.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 6) is **GRANTED**, and Mr. De La Fuente's Motion to Consolidate (ECF No. 14) is **DENIED**.  Mr. De La Fuente's complaint is **DISMISSED WITHOUT PREJUDICE**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  April 23, 2019                                    RUDOLPH CONTRERAS

United States District Judge